**ALLIANCE DATA SYSTEMS CORPORATION,**
Plaintiff,

v.

**BLACKSTONE CAPITAL PARTNERS V L.P. and Aladdin Solutions, Inc. f/k/a Aladdin Holdco, Inc.,** Defendants.

C.A. No. 3796–VCS.

Court of Chancery of Delaware.

Submitted: Oct. 17, 2008.
Decided: Jan. 15, 2009.

Joel Friedlander, Esquire, Evan O. Williford, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; R. Laurence Macon, Esquire, Mary L. O'Connor, Esquire, Lisa S. Gallerano, Esquire, Edwin T. Aradi, Esquire, Akin Gump Strauss Hauer & Feld LLP, Dallas, Texas; Stuart L. Shapiro, Esquire, Michael I. Allen, Esquire, Yoram J. Miller, Esquire, Shapiro Forman Allen & Sava LLP, New York, New York, Attorneys for Plaintiff.

A. Gilchrist Sparks III, Esquire, R. Judson Scaggs, Jr., Esquire, Leslie A. Polizoti, Esquire, Christine J. Dealy, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Bruce D. Angiolillo, Esquire, Jonathan K. Youngwood, Esquire, Alan C. Turner, Esquire, Simpson Thacher & Bartlett LLP, New York, New York, Attorneys for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

Alliance Data Systems Corporation ("ADS") has brought this action to recover cash it feels it is owed by defendant Blackstone Capital Partners V L.P. ("BCP V") after BCP V's failed acquisition of ADS (the "Merger"). On May 17, 2007—near the end of the most recent mergers and acquisition upsurge—ADS entered into an Agreement and Plan of Merger (the "Merger Agreement") with defendant Aladdin Solutions, Inc. ("Aladdin Solutions") and Aladdin Merger Sub, Inc. ("Aladdin Merger Sub," together with Aladdin Solutions, "Aladdin"), two companies formed by BCP V and its affiliates for the purpose of acquiring ADS. BCP V is controlled by the Blackstone Group, L.P. (the "Blackstone Group," together with its non-Aladdin affiliates, "Blackstone"), a large private equity firm. Neither BCP V nor Blackstone signed the Merger Agreement, and they are outside the clear definition of "Party" used in that Agreement.

Among the conditions in the Merger Agreement to Aladdin's obligation to close the acquisition of ADS is a requirement that certain regulatory approvals be obtained. Because ADS owns World Financial Network National Bank ("World Financial"), the Merger required the approval of the Office of the Comptroller of the Currency (the "OCC"). In the Merger Agreement, Aladdin promised to use its reasonable best efforts to obtain the OCC's approval. But, Aladdin made no promise that it would cause BCP V or any BCP V affiliate to undertake any affirmative action to achieve OCC approval.

When OCC approval was sought for Aladdin's acquisition of World Financial, the OCC refused to give that approval unless Blackstone promised to provide any extra capital and liquidity World Financial might need. Blackstone objected, not wanting to put its own assets, or those of its investment funds, on the line to ensure that a single subsidiary met regulatory requirements. But, there is no dispute that Aladdin itself, consistent with its obligations to use its reasonable best efforts, made substantial concessions to the OCC in order to meet the OCC's concerns. The OCC was not satisfied, however, with assurances offered by Aladdin alone, and insisted on holding the Blackstone Group—and a dozen or so of its affiliates—responsible for certain assurances. In months of negotiations over approval, Blackstone and the OCC never successfully bridged this conceptual gap. Although the OCC changed the extent of the commitment it required over time, it continued to ask that Blackstone pledge some support for World Financial, and it wanted Blackstone and its affiliates to sign a wide-ranging acknowledgment of World Financial's regulatory requirements. As a bottom-line, the OCC made it clear that "Blackstone must provide some type and measure of financial support for [World Financial]." [1] Blackstone ultimately refused to sign any agreement that made it and its affiliates—other than Aladdin itself—responsible for ensuring that World Financial met its capital and liquidity requirements. As a result, the Merger was not completed within the time frame set out in the Merger Agreement, and Aladdin purported to terminate the Agreement.

In the Merger Agreement, ADS forewent the remedy of specific performance

---

1. Amended Verified Complaint ("Compl.") Ex. C (letter from Lawrence E. Beard, Deputy Comptroller, Office of the Comptroller of the Currency, to John L. Walker, Simpson Thacher & Bartlett LLP (Mar. 5, 2008)) at 7 (emphasis added).

except in certain, defined circumstances and accepted a cap on its ability to recover monetary damages for breach. When ADS seeks a monetary remedy in the event of a breach by Aladdin resulting in non-consummation of the Merger, as in this case, ADS is limited to the recovery of a termination fee—termed a "Business Interruption Fee"—in the amount of $170 million from Aladdin. The payment of this Fee by Aladdin, in the event it is owed to ADS, is guaranteed by BCP V through a Limited Guarantee that ADS and BCP V entered into on the same day the Merger Agreement was executed.

ADS brought this suit alleging that Aladdin breached its obligations under the Merger Agreement by failing to reach an accord with the OCC, and that the Business Interruption Fee is due and owing. ADS has sued Aladdin and BCP V, seeking to require them to pay the Business Interruption Fee.

ADS argues that Aladdin breached the Merger Agreement by failing to cause Blackstone to assent to the demands the OCC made of Blackstone and its affiliated funds. Characterizing the OCC's final proposal as virtually costless to Blackstone, despite the fact that the OCC thought the proposal important enough to insist on it, ADS argues that Aladdin had a responsibility under the Merger Agreement to force Blackstone to agree to the OCC's terms. To support this argument, ADS cites three provisions of the Merger Agreement: a promise by Aladdin to use Aladdin's reasonable best efforts to get OCC approval; a promise by Aladdin to keep Blackstone from preventing the completion of the Merger; and a representation by Aladdin that it had the power to fulfill its commitments under the Merger Agreement.

In this opinion, I grant the defendants' motion to dismiss ADS's "Amended Verified Complaint" (the "Complaint"). For starters, I find that any contractual claim against the defendants must be predicated on a breach by Aladdin because it is the only party, aside from ADS, that signed the Merger Agreement. Next, looking at the Merger Agreement, I find that there was no requirement that Aladdin somehow force Blackstone to enter into any arrangement with the OCC. The first provision ADS cites, which requires that Aladdin use its reasonable best efforts, clearly applies only to Aladdin's efforts. The Complaint is devoid of any contention that Aladdin itself was unwilling to comply with the demanding conditions the OCC asked of it. The Complaint only faults Aladdin because Blackstone, a non-party to the Merger Agreement, would not enter into arrangements with the OCC. But, Blackstone had no contractual obligation to enter into such arrangements, and Aladdin made no contractual promise that it would get Blackstone to do so.

What Aladdin did contractually promise is that it would ensure (at the cost of committing a compensable breach) that Blackstone would not "take or cause or permit to be taken any action (including the acquisition of businesses or assets) which would reasonably be expected to prevent or materially impair or delay the consummation of the transactions contemplated by this Agreement."[2] That is, Aladdin agreed to a negative covenant promising to assure that Blackstone would not thwart the Merger by taking action to impede its closing. ADS seizes upon this promise and tortures its plain meaning by arguing that Blackstone's failure to assent to the OCC's demands amounted to an action that impaired the consummation of the Merger. In other words, ADS seeks

2. Compl. Ex. A ("Merger Agreement") § 6.5.6.

to turn a negative covenant with an accepted commercial meaning into a wide-ranging promise to take any affirmative action necessary to obtain regulatory approval. The language of the covenant will not sustain such a reading, and that reading is also inconsistent with the structure of the Merger Agreement itself. The Merger Agreement has a section that governs the obligations of the parties to take affirmative steps to obtain regulatory approvals. That section creates an affirmative obligation on Aladdin's part to use its own best efforts to achieve OCC approval, but does not, in stark contrast to the negative covenant, obligate Aladdin to get Blackstone to do anything affirmative toward that end.

ADS also seeks to infer from Aladdin's promises about Blackstone that ADS was representing that it had control over Blackstone. But, while Aladdin did make promises about Blackstone, those promises were carefully cabined. Aladdin only promised that it could make Blackstone behave in certain ways, not that it could force Blackstone to agree to financial commitments not found in the Merger Agreement.

As its overarching argument, ADS departs entirely from the text of the Merger Agreement itself. In the Complaint, ADS contends that all the negotiators of the Merger Agreement were aware that the OCC was likely to demand that Blackstone enter into certain commitments with the OCC as a condition to approving the Merger. ADS says that during negotiations Blackstone knew that the OCC would require that Blackstone submit to some form of liability. But, ADS argues, when the debt markets turned and Blackstone was under pressure from its financing partners not to go forth with the Merger, Blackstone refused to agree to any terms from the OCC, even terms that involved minimal risk to it. This behavior, according to ADS, supports its claim of breach.

But, ADS has eschewed any fraud claim and its attempt to introduce parol evidence is unavailing in the face of clear contractual language. If, as ADS alleges, it was obvious that the OCC would require not just Aladdin, but Blackstone itself, to enter into certain regulatory agreements, then ADS should have insisted that Aladdin be held responsible in the event that Blackstone failed to use best efforts to obtain regulatory approval. In the Merger Agreement, ADS extracted an even stronger form of such a promise from Aladdin in the context of antitrust approval by requiring Aladdin to get Blackstone to take whatever steps were necessary to get antitrust approval, including divesting other holdings. But, as to OCC approval, all that ADS got was a promise from Aladdin itself to use reasonable best efforts, and no obligation on Aladdin's part to cause Blackstone to do anything. The time for ADS to have protected itself from the risk that the OCC would make demands that Blackstone would not accept was when negotiating the words of the Merger Agreement. Instead of getting contractual assurances from Aladdin that Aladdin would pay the Business Interruption Fee unless Blackstone used best efforts—or some other form of efforts—to satisfy the OCC, ADS got nothing. Having struck a clear bargain, ADS cannot resort to extrinsic evidence to manufacture contractual obligations that are clearly foreclosed by an unambiguous Merger Agreement.

For that same reason, and for the additional reason that it never pled this claim in the Complaint, ADS's argument that the implied covenant of good faith and fair dealing holds Aladdin responsible for the failure of Blackstone, a non-party, to enter into a regulatory agreement that Black-

stone had no duty to accept is without force. The explicit terms of the Merger Agreement are inconsistent with any implied duty on Aladdin of this kind.

Because ADS has not pled a viable claim for breach of the Merger Agreement, I dismiss its claim.

## II. *Factual Background*

Because this is a motion to dismiss, I have drawn all reasonable inferences in favor of ADS, who is the plaintiff in this action. All of the facts I rely upon are drawn either from the Complaint or the numerous documents ADS attached to the Complaint.[3] ADS chose to incorporate into the Complaint not only the Merger Agreement and the Limited Guarantee, but also a substantial set of documents related to the OCC merger approval process, including: letters from Blackstone to the OCC; OCC letters to Blackstone; the agreements that the OCC wanted Blackstone to sign; a Blackstone press release; and several letters among various players in the negotiations between ADS, Aladdin, and Blackstone regarding the obstacles to closing the Merger.

Because ADS chose to attach these documents, I consider them, but construe any ambiguities in them in favor of ADS, consistent with the plaintiff-friendly standard applicable on a Rule 12(b)(6) motion.

### A. *The Parties*

Plaintiff ADS is a Delaware corporation that describes itself as a "provider of marketing, loyalty and transaction services, managing over 120 million customer relationships for some of North America's most recognizable companies."[4] Among

its subsidiaries is World Financial, a "credit card bank regulated by the OCC."[5]

Defendant BCP V is a Delaware limited partnership. It is a $20 billion acquisition fund, which, put simply, means it is an investment fund that exists to buy and sell operating companies with the intention of generating profitable returns for the fund's investors. BCP V is one of several such funds operated by the Blackstone Group. ADS has not sued the Blackstone Group in this case.

Defendant Aladdin Solutions is a Delaware corporation. It was formed by Blackstone for the purpose of acquiring ADS. At the time of the Merger Agreement, Aladdin Solutions was known as Aladdin Holdco, Inc., and owned 100% of Aladdin Merger Sub, another Delaware corporation. In its Complaint, ADS characterizes both Aladdin Solutions and Aladdin Merger Sub as "assetless shell companies."[6] This, of course, is a rhetorical flourish that is a tad overstated. Aladdin likely had assets in the form of contractual commitments by BCP V and certain investment banks to provide the equity and debt funding necessary to consummate the acquisition of ADS. But, the bottom line is that ADS is accurate in pointing out that Aladdin was an acquisition vehicle with no business or cash of its own, other than assets given to it to enable it to acquire ADS. Equally clear, however, is that ADS was well aware of this at the time it entered the Merger Agreement with only Aladdin, and not Blackstone, as a signatory on the buyer's side.

### B. *ADS And Aladdin Sign The Merger Agreement*

After what ADS describes as "detailed

---

3. *See* Ct. Ch. R. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

4. Compl. ¶ 6.

5. Id.

6. Compl. ¶ 7.

due diligence and negotiations," [7] ADS entered into the Merger Agreement with Aladdin Solutions and Aladdin Merger Sub on May 17, 2007. Under that Agreement's terms, Aladdin Merger Sub was to merge into ADS. Every share of ADS was to be canceled and exchanged for $81.75 in cash, and Aladdin was to assume all of ADS's debt. All in, BCP V's acquisition costs would have been $7.8 billion. To raise that money, BCP V planned to invest $1.8 billion of its own cash in equity and to borrow an additional $6.6 billion. [8]

The only signatories to the Merger Agreement were ADS on the sell side, and the Aladdin entities on the other. Neither BCP V nor Blackstone itself was a signatory. The definition of "Parties" in the Merger Agreement does not include either BCP V or Blackstone. [9]

ADS alleges in the Complaint that during the course of the negotiations over the Merger Agreement, its representatives discussed with negotiators on the buy side the likelihood that the OCC would seek commitments Blackstone, and not simply Aladdin, regarding the capital levels and solvency of World Financial. [10] According to ADS, the negotiators discussed a previous transaction in which the OCC demanded financial assurances from the ultimate parent of a bank as a condition to approving a merger, making the OCC's later demands to Blackstone something predictable to the negotiators of the Merger

Agreement. ADS also claims that later, during post-signing negotiations about how to obtain OCC approval, Blackstone indicated that it was willing to provide assurances similar to what had been required in the previous transaction. [11] The Complaint does not allege that Blackstone said it would accept these conditions when the Merger Agreement was being negotiated. Instead, ADS pleads only that during the contract negotiations no Blackstone representative "suggested that Blackstone was unwilling to provide" the type of guarantee the OCC eventually sought. [12]

Because this is a motion to dismiss, these allegations must be accepted as true. But, at the same time, because ADS has brought claims for breach of contract, these allegations are also extrinsic evidence. What is perhaps most striking about them is the discordance between them and the actual contractual commitments that ADS extracted at the bargaining table. In other words, if one accepts, as I must do for present purposes, that oral banter of the kind just described occurred, and that it should have been obvious that the OCC would require a commitment from Blackstone, what is most striking is how far short of embodying that discussion and the accompanying reality in a binding contractual commitment ADS fell.

A review of the provisions of the Merger Agreement that are especially impor-

7. Compl. ¶ 8.

8. The Complaint does not indicate what the extra $600 million was for.

9. *See* Merger Agreement at 1.

10. Compl. ¶ 24. Unfortunately, ADS's Complaint is not a model of clarity as to when the relevant discussions took place. The relevant paragraph in the Complaint does not state the date these discussions occurred. *See id.* And, at oral argument, ADS admitted that

some of Blackstone's alleged statements were made when the parties were seeking OCC approval, *after* the Merger Agreement was executed. Tr. at 92. But, the paragraph in question follows a discussion about what should have been known before the signing of the Merger Agreement, so I consider the issue as if the matters in ¶ 24 were discussed before signing.

11. Compl. ¶ 31.

12. Compl. ¶ 25.

tant to the resolution of this motion begins the demonstration of this reality. First, it is worth reiterating that neither Blackstone nor BCP V even signed the Merger Agreement. At best, therefore, as we shall see, ADS negotiated to hold Aladdin responsible in certain limited situations for behavior by Blackstone. But, the Merger Agreement imposed no direct contractual obligations on either Blackstone or BCP V to act to obtain OCC approval.

Second, the closing is conditioned on certain regulatory approvals having been obtained, including approval by the OCC, an indication that the drafters focused on the particular regulatory risk at issue in this case. If all the necessary regulatory approvals were not obtained, then neither party had to go through with the Merger.[13] At the same time, in § 6.5.1, the parties to the Merger Agreement (ADS, Aladdin Solutions, and Aladdin Merger Sub) promised to each use their:

> reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable under applicable Laws to consummate and make effective, in the most expeditious manner practicable, the transactions provided for in this Agreement, including ... the taking of such actions as are necessary to obtain any requisite approvals, consents, Orders, exemptions or waivers by, or to avoid an action by, any Third Party or Governmental Entity relating to antitrust, merger and acquisition, competition, trade, banking or other regulatory matters.[14]

Section 6.5.1 did not impose any obligation on Aladdin to secure cooperation from Blackstone in obtaining approval from the OCC, a reality made clear by the fact that § 6.5.1 did impose such a duty on Aladdin as to antitrust approval. To that end, in a subsequent sentence of § 6.5.1, Aladdin covenants to cause Blackstone to act in whatever way is necessary to secure antitrust approval.[15] But, in sharp contrast to that antitrust provision, the only best efforts obligation as to OCC approval was imposed on Aladdin alone, and not Blackstone.

The most that ADS extracted as to Blackstone, in terms of the OCC approval process, was a negative covenant. In § 6.5.6, Aladdin covenanted to "cause [Aladdin Solutions and its affiliates] not to" take any action "which would reasonably be expected to prevent or materially impair or delay [the Merger]."[16] That is, ADS did get Aladdin to commit that it would be liable for breach of contract if it could not get Blackstone to refrain from taking any actions that would prevent or delay the Merger.

The Merger Agreement also strictly limits Aladdin's exposure to monetary liability in the event it commits a breach of the contract. In a case for monetary damages, ADS is only entitled to receive a $170 million Business Interruption Fee from Aladdin Solutions.[17] ADS protected its ability to receive the Business Interruption Fee by entering into a "Limited Guarantee" with ADS to ensure that someone with cash would be liable if there was a breach giving rise to a right of ADS to receive the Business Interruption Fee.[18]

---

13. Merger Agreement § 7.1.2.

14. Merger Agreement § 6.5.1.

15. Id.

16. Merger Agreement § 6.5.6.

17. Merger Agreement §§ 8.1(c)(i); 8.5.1.

18. BCP V also guaranteed up to $3 million dollars in compensable ADS expenses related to securing financing and engaging in debt tender offers. Compl. Ex. B ("Limited

The Limited Guarantee was a purely financial commitment, only designed to make sure that if there is a breach, ADS was not left trying to sue companies that lacked the resources to compensate ADS. Nothing in the Guarantee required BCP V or any other part of Blackstone to undertake any obligation to see that the Merger itself was consummated.

## C. *The OCC Approval Process Derails The Merger*

Because Aladdin would acquire World Financial, a credit card bank, as part of the Merger, the transaction needed the OCC's blessing.[19] But, once the approval process got underway, it became evident that the OCC and Blackstone had very different pictures of Blackstone's post-Merger role: Blackstone saw itself as an investor protected by limited liability, whereas the OCC saw Blackstone as a source of funds that would make sure that World Financial continued to meet its regulatory obligations.

This was a divide of precedential importance for both the OCC and Blackstone. From the OCC's perspective, it was wary of the high leverage with which private equity firms manage their operating companies, and it wished to establish that the ultimate private equity parent of any bank the OCC regulated was on the hook to support that bank. From Blackstone's perspective, it was reluctant to assent to having one of its funds, much less the ultimate core Blackstone parent entity, on the hook to a federal regulatory agency for

a particular portfolio company's capital levels and solvency. It was one thing for the regulatory agency to extract capital and other requirements from the operating company itself, but to go further and have a particular Blackstone fund—with obligations to its investors to return their capital on agreed terms—tie up its capital through agreements with a federal regulator was highly problematic. As we shall see, this fundamental impasse in viewpoints was never resolved.

In late June 2007, a little over a month after the Merger Agreement was signed, Blackstone, BCP V, and Aladdin submitted a Notice of Change of Control to the OCC. Almost five months later, on November 19, the OCC sent Blackstone a proposal requiring that it provide "an unlimited source of strength commitment" in exchange for the OCC's approval.[20] As then contemplated by the OCC, Blackstone would promise to provide any financial support necessary to make sure that World Financial complied with its minimum liquidity and capital requirements.[21] This would have forced Blackstone to pay out a potentially unlimited amount of its own money to ensure that World Financial met regulatory requirements. But, Blackstone was not anxious to pierce its limited liability and put all of its assets at risk. Blackstone's business model is to operate a series of funds, of which BCP V is an example. These funds make money for their owners by investing in operating businesses that are operated through limit-

---

Guarantee") § 1; Merger Agreement §§ 6.15, 6.16.3, 6.16.6.

19. Defs.' Op. Br. at 2; Pl.'s Ans. Br. at 2.

20. Compl. ¶ 28. ADS apparently had made such a commitment before the events at issue in this litigation. Id.

21. *See* Compl. Ex. F (letter from Lawrence E. Beard, Deputy Comptroller, Office of the

Comptroller of the Currency, to John L. Walker, Simpson Thacher & Bartlett LLP (Jan. 23, 2008)) at 4 (noting that one of the proposed agreements in the OCC's initial proposal would have obligated Blackstone "to provide the financial support needed for [World Financial] to remain in compliance with its capital and liquidity requirements").

ed liability entities to prevent the under-performance of any single company from harming a fund's investment in other companies. In other words, Blackstone seeks to cabin its risk for any portfolio company by restricting its investment in each company in a disciplined way. Likewise, its portfolio companies are held through specific funds, which each have specific investment horizons and criteria and obligations to their investors to return their capital after particular time periods have elapsed. For BCP V itself to enter into an obligation forcing it to deploy additional capital to a particular portfolio company was therefore highly problematic, and the notion that the ultimate Blackstone parent entity (or its family of funds) would do so was even more difficult. Therefore, in several ensuing submissions, Blackstone attempted to persuade the OCC that its demand that a private equity firm like Blackstone give unlimited commitments was unreasonable and unnecessary.[22]

Blackstone's efforts at persuasion had only a limited effect. The OCC made a second proposal (the "OCC Proposal") that included two agreements of particular relevance to this motion: a "Capital Assurance and Liquidity Maintenance Agreement" and a "Capital and Liquidity Support Agreement" (together the "Proposed Agreements"). Unless Blackstone signed those Agreements, the OCC stated that it would consider Blackstone's application to be incomplete and would not even "decide

whether or not to disapprove" the Merger.[23]

The Proposed Agreements themselves are rather odd documents. In addition to the signatures of the parties to the Merger Agreement (Aladdin Solutions, Aladdin Merger Sub, and ADS) and World Financial, the OCC wanted the signatures of the Blackstone Group and a dozen of its affiliates (together, the "Blackstone Entities"). The Proposed Agreements start with broad and lengthy acknowledgments whose precise legal effect is not apparent, but whose breadth could provide the OCC with strong political and public relations leverage in a situation where World Financial suffered a liquidity or capital shortage. As proposed, the Blackstone Entities had to "acknowledge that [World Financial] is obligated to maintain sufficient capital such that [World Financial's] capital meets or exceeds the levels required by the Operating Agreement."[24] Similar "acknowledgments" had to be made about World Financial's liquidity.[25] And, in the event that World Financial needed money to meet its minimum capital and liquidity requirements, it was to "immediately notify" the Blackstone Entities.[26]

Under ADS's reading, both at the time that negotiations with the OCC were ongoing and in the context of this litigation, these broad acknowledgments were rendered meaningless by the rest of the Agreements. Specifically, ADS asserted,

22. Among Blackstone's submissions were "various liquidation scenarios demonstrating that, even under the most pessimistic scenarios, [World Financial] could fulfill its obligations without ever having to draw on any backup source of strength commitment from Blackstone." Compl. ¶ 32.

23. Compl. Ex. F at 1.

24. Compl. Ex. G ("Capital Assurance and Liquidity Maintenance Agreement") art. I § 1;

see also Compl. Ex. H ("Capital and Liquidity Support Agreement") art. II § 1.

25. Capital Assurance and Liquidity Maintenance Agreement art. II § 1; see also Capital and Liquidity Support Agreement art. III § 1.

26. Capital Assurance and Liquidity Maintenance Agreement art. I § 2, II § 2; see also Capital and Liquidity Support Agreement art. II § 2, III § 2.

and continues to assert, that Blackstone should not care about the fact that the OCC wanted Blackstone to make broad declarations to the federal government because this commitment was carefully cabined under the rest of the Proposed Agreements.

In the mechanics of the Proposed Agreements, ADS and Aladdin Solutions were to act as a first line of defense. They were to contractually promise to provide whatever funds were necessary to maintain World Financial's capital and liquidity requirements, and, almost immediately after the Proposed Agreements were signed, ADS and Aladdin Solutions would have had to provide a $400 million credit facility that World Financial could use to support itself (the "ADS Fund").[27]

If ADS and Aladdin Solutions did not create the ADS Fund or failed to maintain it, then the Blackstone signatories would have had to provide a $400 million credit facility of their own.[28] World Financial would then be able to draw down on that credit facility to maintain its minimum liquidity and capital requirements.[29] Thus, although Blackstone's commitment was second in line, the OCC continued to require that Blackstone guarantee that World Financial would meet its ongoing regulatory requirements.

But, the parties fundamentally disagree about what this requirement actually meant. ADS argues that Blackstone would have had no responsibilities unless the ADS Fund was never funded, became inaccessible, or had investment losses. Blackstone contends that the OCC Proposal would have also required a commitment in the event that the ADS Fund was depleted and World Financial needed more capital or liquidity.[30]

Unfortunately, the OCC did not help to clarify this matter in the letters it sent to Blackstone's lawyers while the discussions about the OCC Proposal were ongoing. In an early letter, the OCC stated that Blackstone would only have to provide a source of strength if ADS and Aladdin Solutions "had not provided or maintained the collateral or other security required of them."[31] But, in a subsequent letter, sent only two days before the Merger Agreement's drop dead date, the OCC stated that Blackstone would have to fund any shortfall at World Financial "if ADS and [Aladdin Solutions] had failed to perform on their obligations ... and the [ADS Fund] had failed."[32] Because this is a motion to dismiss, I give ADS the benefit of this dispute, meaning that I evaluate this motion as if the OCC only required that Blackstone provide a credit facility if the ADS Fund was never funded or was not properly maintained.

After the January 2008 OCC Proposal, the relationship between Blackstone and Aladdin apparently became much more strained. Two days after the OCC communicated its Proposal, Aladdin contacted

27. The Proposed Agreements gave ADS and Aladdin the choice of providing a pledge of collateral, obtaining a letter of credit, or obtaining a revolving credit facility. *See, e.g.,* Capital Assurance and Liquidity Maintenance Agreement art. III § 1, art. IV § 1, art. V § 1. For simplicity's sake, I refer to these possibilities as obtaining a credit facility.

28. Capital Assurance and Liquidity Maintenance Agreement art. VI § 1.

29. Capital Assurance and Liquidity Maintenance Agreement art. VI § 3.

30. Defs.' Op. Br. at 9.

31. Compl. Ex. C at 5.

32. Compl. Ex. R (letter from Lawrence E. Beard, Deputy Comptroller, Office of the Comptroller of the Currency, to John L. Walker, Simpson Thacher & Bartlett LLP (Apr. 16, 2008)) at 1.

ADS to inform it that the OCC Proposal demanded "extraordinary measures" from ADS, Aladdin, and Blackstone and, as a result, OCC approval would likely not be obtained, and thus the Merger Agreement's closing conditions would likely not be met.[33] This was followed three days later by a press release in which Blackstone stated that it remained committed to the Merger, but the OCC was requiring "unprecedented and unacceptable financial and operational requirements that would impose an unlimited and indefinite liability" on Blackstone.[34]

ADS brought its first lawsuit in late January 2008, arguing that Aladdin was breaching the Merger Agreement by refusing to assent to the OCC's demands. Within ten days of filing, ADS withdrew its suit, and Aladdin continued to seek OCC approval of the Merger, with ADS offering concessions to help bridge the gap between Blackstone and the OCC.

Specifically, in February 2008, ADS offered to reduce the purchase price in the Merger Agreement by $400 million to induce Blackstone to agree to the OCC Proposal.[35] ADS contends that Blackstone could have put the $400 million it would have paid to ADS stockholders in U.S. Treasury securities and used those assets to secure the ADS Fund. Thus, in ADS's estimation, the creation of the ADS Fund would not have placed an additional burden on Blackstone, and with the money supporting that Fund invested in Treasury securities, there would be little chance that Blackstone's own assets would ever be called upon under its secondary commit-ments. In ADS's reading, the OCC Proposal would not "expos[e] Blackstone to any meaningful risk or expense."[36] The defendants, however, stress that Blackstone would have had to set aside $400 million in capital to satisfy Blackstone's commitment in case it was ever called, and that, regardless, Blackstone was still being asked to assume a contingent liability, even if the probability of ever paying out was relatively small. It is also clear from the OCC communications attached to the Complaint that the OCC viewed Blackstone's written commitment to be materially and substantively valuable to it as a regulatory agency.

Taking advantage of ADS's concession, Aladdin made its own counter-proposal to the OCC. On February 19, Aladdin offered to accept a number of conditions at the World Financial and ADS levels and to put the $400 million concession by ADS into liquid securities (defined to be cash, treasuries, insured deposits, and anything else the OCC agreed to) and pledge those securities to guarantee that World Financial meets its minimum capital and liquidity requirements.[37] The result would have been exactly what ADS wanted Blackstone to agree to, just without Blackstone's secondary commitment, which ADS portrays as not a meaningful risk or expense. But, the OCC, apparently feeling as Blackstone did that the OCC Proposal *did* require some meaningful commitment on Blackstone's part, refused to approve the new arrangement. Consistent with its previous statements, the OCC refused to give its approval unless Blackstone and twelve of

---

**33.** Compl. Ex. I (letter from Aladdin Solutions, Inc. to Alliance Data Systems Corporation (Jan. 25, 2008)).

**34.** Compl. Ex. J (Press Release, The Blackstone Group, Blackstone Willing to Try to Complete Alliance Deal (Jan. 28, 2008)).

**35.** In early February, a group of ADS stockholders also offered to provide $400 million to create the ADS Fund.

**36.** Compl. ¶ 68.

**37.** *See* Compl. Ex. K.

its affiliates provided a backup source of strength that could be drawn down if the ADS Fund failed. Ultimately, it wanted Blackstone to be on the hook for something, stressing that "the OCC believes in this case it is appropriate *to require some form of financial responsibility from the ultimate controlling owners,*" and that "*Blackstone must provide some type and measure of financial support for [World Financial].*" [38]

This fundamental divide was never closed. Despite several rounds of letters among ADS, Blackstone, Aladdin, and the OCC, the OCC continued to demand that Blackstone provide a backup source of strength, and Blackstone refused to incur any obligation on the part of itself or any entities it controlled besides Aladdin Solutions and Aladdin Merger Sub.

On April 18, Aladdin attempted to terminate the Merger pursuant to § 8.1(b)(ii) of the Merger Agreement, which allows any non-breaching party to terminate the Agreement if the Merger did not close by April 18. ADS maintains that Aladdin's termination was invalid because Aladdin had breached the Agreement, and responded by terminating the Merger Agreement under another provision that allows ADS to terminate the Merger Agreement in the event of a breach by Aladdin and which entitles ADS to the Business Interruption Fee.[39]

### D. *The Counts In The Complaint*

ADS brings its Complaint against only Aladdin Solutions and BCP V, and not the Blackstone Group. In the first count of the Complaint, ADS alleges that Aladdin breached the Merger Agreement by refusing to pay the Business Interruption Fee, as well as $3 million in fees and expenses that ADS incurred in connection with the

Merger approval process. ADS contends that Aladdin is liable because its failure to use its reasonable best efforts to secure the OCC's approval, and its failure to keep Blackstone from impeding the Merger's approval (by declining to agree to the OCC's demands), were material breaches of §§ 6.5.1 and 6.5.6 of the Merger Agreement that gave rise to the failure of the regulatory approval closing condition. In the second count of the Complaint, ADS alleges that BCP V breached the Limited Guarantee by not paying ADS the Business Interruption Fee and other amounts ADS claims it is owed.

The defendants have moved to dismiss both claims under Rule 12(b)(6), asserting that ADS has not stated a claim that Aladdin breached the Merger Agreement, and therefore neither Aladdin nor BCP V was ever obligated to pay ADS the Business Interruption Fee or its expenses. Their core argument is that the Merger Agreement imposed no duty on Blackstone (or on Aladdin to cause Blackstone) to take any affirmative action to obtain the OCC's approval for the Merger. Because the Merger Agreement imposed no obligation on Blackstone to assent to any demands by the OCC, and because the only beef ADS has with Aladdin is based on Blackstone's refusal to bend to the will of the OCC, ADS has, in the defendants' view, failed to state a claim for breach of the Merger Agreement.

### III. *Legal Analysis*

 The question before this court is whether the Complaint states a claim that Aladdin breached the Merger Agreement. "Under Delaware law, the proper interpretation of language in a contract is a

---

**38.** Compl. Ex. C at 6–7 (emphasis added).

**39.** *See* Merger Agreement § 8.1(c)(i).

question of law."[40] When interpreting a contract, a court's task is to "satisfy the reasonable expectations of the parties at the time they entered into the contract."[41] In doing so, a court will only look at evidence outside of the contract where "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[42]

Thus, even though I must accept ADS's allegations regarding the Merger Agreement negotiation process as true, that parol evidence is irrelevant if the Merger Agreement is unambiguous and susceptible of only one reasonable interpretation.[43] In this regard, it bears emphasis that ADS has not brought a fraud claim and relies entirely on a theory of contractual breach.[44]

The parties also agreed that the Merger Agreement contains the entirety of their bargain. The Merger Agreement states that "[t]his Agreement [and certain related documents] constitute the entire agreement of the Parties and supersede all prior agreements and undertakings, both written and oral, between the Parties, or any of them, with respect to the subject matter hereof and thereof."[45] In addition, although the parties to the Merger Agreement made many representations in the Merger Agreement, they prominently disclaimed any other representations they might have made:

> EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NONE OF [Aladdin Solutions], [Aladdin Merger Sub] AND [ADS] MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY disclaims any other representations or warranties made by itself [or any of its representatives] with respect to the execution and delivery of this Agreement or the Merger [except for certain representations related to disclosure and other documentation].[46]

### A. No Blackstone Entity Was A Party To The Merger Agreement

■ Absent unusual circumstances not present here, the ordinary rule is that only the formal parties to a contract are bound by its terms.[47] The Merger Agreement was only signed by three parties: Aladdin Merger Sub, Aladdin Solutions, and ADS.[48] Accordingly, only those three parties had

---

**40.** *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del.Ch.2006).

**41.** *Liquor Exch., Inc. v. Tsaganos,* 2004 WL 2694912, at *2 (Del.Ch. Nov.16, 2004) (citing *Bell Atlantic Meridian Systems v. Octel Commc'ns Corp.,* 1995 WL 707916 (Del.Ch. Nov.28, 1995)).

**42.** *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,* 693 A.2d 1059, 1061 (Del.1997) (quoting *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992)).

**43.** *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." (citing *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991); *Citadel Holding Corp. v. Roven,* 603 A.2d 818 (Del.1992))).

**44.** Tr. at 93 ("But there's no fraud claim we made here. It's a contractual claim.").

**45.** Merger Agreement § 9.5.

**46.** Id. (emphasis in original).

**47.** *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood,* 752 A.2d 1175, 1180 (Del.Ch.1999) ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract.").

**48.** *See* Merger Agreement.

obligations under that Agreement. No other Blackstone affiliate entered into the Merger Agreement, and thus they did not have any obligations under the Agreement.

The only other entity that signed an agreement with ADS was BCP V. In conjunction with the Merger, BCP V entered into the Limited Guarantee, under which it promised ADS that it would guarantee Aladdin's payment of the $170 million Business Interruption Fee, as well as up to $3 million in ADS costs related to financing and debt tender offers. But that was the extent of BCP V's commitment in the Limited Guarantee. BCP V only promised to pay those fees if Aladdin had to pay those fees. It did not promise to perform in any other way.[49]

ADS recognizes that Blackstone and BCP V have no direct obligations under the Merger Agreement themselves. What it does argue, however, is that Aladdin agreed to be responsible for a breach in certain circumstances if Blackstone and BCP V failed to take certain actions related to the OCC approval process. Thus, both BCP V's and Aladdin's liability turn on the same fundamental question: is Aladdin liable for a breach of the Merger Agreement because Blackstone refused to agree to the OCC's demands?

**B.** *The Merger Agreement Did Not Make Aladdin Contractually Responsible For Any Refusal Of Blackstone To Negotiate With Or Agree To Terms With The OCC*

ADS bases its claims on three provisions of the Merger Agreement summarized earlier: (1) § 6.5.1, a covenant by Aladdin to use its reasonable best efforts to secure necessary regulatory approvals; (2) § 6.5.6, a covenant by Aladdin to keep Blackstone from preventing or impeding the completion of the Merger; and (3)

§ 5.2, a representation in which Aladdin stated that it had the power to fulfill its obligations under the Merger Agreement. The crux of ADS's argument under all three provisions is that Aladdin was responsible for making Blackstone agree to the OCC Proposal, and because Blackstone did not agree to what ADS considers to be a fair proposal, there was a breach of the Merger Agreement. But, none of those provisions makes Aladdin responsible for forcing Blackstone to agree to the OCC Proposal. Thus, ADS cannot state a claim for breach of contract by complaining that Blackstone did not agree to the OCC Proposal.

**1.** *ADS Does Not State A Claim That Aladdin Breached § 6.5.1 Of The Merger Agreement*

■ The first provision in the Merger Agreement that ADS claims was breached, § 6.5.1, is a promise by the parties to that Agreement to use their reasonable best efforts to complete the Merger. ADS contends that in this section Aladdin promises to make Blackstone act to get OCC approval. But, that argument fails because the clear and unambiguous language of the Merger Agreement shows that, in contrast to certain other sections in the Merger Agreement, in § 6.5.1, Aladdin only promises that it will use its own reasonable best efforts, not that Blackstone will use any effort. And, ADS has not stated a claim that Aladdin did not use its reasonable best efforts.

**a.** *Section 6.5.1 Only Required Aladdin, And Not Blackstone, To Use Its Reasonable Best Efforts To Secure Regulatory Approval*

The covenant concerning OCC approval, and most of the other regulatory approv-

**49.** *See* Limited Guarantee.

als, appears in the first sentence of § 6.5.1. That sentence is an affirmative covenant stating that:

> Each *of the Parties* shall use its reasonable best efforts to ... do, or cause to be done, ... all things necessary, proper or advisable under applicable Laws to consummate and make effective, in the most expeditious manner practicable, the transactions provided for in this Agreement, including ... the taking of such actions as are necessary to obtain any requisite approvals, consents, Orders, exemptions or waivers by, or to avoid an action by, any Third Party or Governmental Entity relating to antitrust, merger and acquisition, competition, trade, banking or other regulatory matters.... [50]

This sentence only covers the "Parties," a term defined in the Merger Agreement to be Aladdin Solutions, Aladdin Merger Sub, and ADS.[51] The plain meaning of the above-quoted part of § 6.5.1 imposes no obligation on Blackstone to use *any* effort, or for Aladdin to cause Blackstone to use any effort. This is in sharp contrast to what respected authorities advocate that a seller should extract in the acquisition agreement, which is a covenant by the acquirer that its parent will also work toward completion of the transaction.[52]

Notwithstanding this gap, ADS seizes on the phrase "cause to be done" and argues that this language means that Aladdin was somehow required to cause Blackstone to act. But, as will now be shown, in other sections of the Merger Agreement, when Aladdin was to be contractually on the hook for "causing" Blackstone to do or not do something, the parties made that explicit.[53]

That is, the fact that the parties to the Merger Agreement did not intend to bind Blackstone in the relevant part of § 6.5.1 is underscored by the presence of express covenants about Blackstone in other places in the Agreement. The definitions section of the Merger Agreement includes the phrase "Parent Group," which is defined to include Aladdin Solutions and its affiliates (i.e., Blackstone).[54] That term is used in several places throughout the Merger Agreement. Most notably, in the sentence after the above-quoted language in § 6.5.1, Aladdin covenants that it will make Blackstone act to obtain antitrust approval. Specifically, Aladdin covenants that it "shall, and shall cause each other member of the Parent Group to ... offer to commit to take *any action which it is capable of taking* [to get antitrust approval]."[55] Thus, as to antitrust approval, but not OCC approval, Aladdin committed itself to being held liable for breach of contract if it could not get Blackstone to do what was necessary to get regulatory approval.

Similarly, there are other specific parts of the Merger Agreement where Aladdin agreed to be contractually responsible for actions of Blackstone. Most prominently,

50. Merger Agreement § 6.5.1 (emphasis added).

51. Merger Agreement at 1.

52. *See* COMMITTEE ON NEGOTIATED ACQUISITIONS, MODEL STOCK PURCHASE AGREEMENT WITH COMMENTARY § 6.1 (1995) ("Buyer will, and will cause each Related Person to, ... cooperate with Sellers in obtaining all consents...."); CHARLES A. SHARF ET AL., ACQUISITIONS, MERGERS, SALES BUYOUTS AND TAKEOVERS: A HANDBOOK WITH

FORMS 373 (4th ed.1991) (noting that, to bind a corporate parent, the parent should either be a party to the contract or a covenant should be made about its actions).

53. *See, e.g.*, Merger Agreement § 6.5.6.

54. Merger Agreement at 5.

55. Merger Agreement § 6.5.1 (emphasis added).

Aladdin promised in § 6.5.6 to be liable if Blackstone prevents or impedes the closing of the Merger.[56] In another section, Aladdin made representations about Blackstone's investments.[57] Therefore, it is clear that ADS knew how to make Aladdin liable for the actions of Blackstone. And, the parties clearly understood that Blackstone and BCP V were separate legal entities from Aladdin. That was why they carefully and specifically identified those instances where Aladdin was responsible for the actions of those entities. The fact that ADS made sure to negotiate for a Limited Guarantee from BCP V is another example of this reality. Understanding that Aladdin Solutions and Aladdin Merger Sub were acquisition vehicles with limited assets, ADS secured a commitment from BCP V to ensure that the Business Interruption Fee would be paid if Aladdin committed a breach.

Stated summarily, the Merger Agreement is clear about those limited instances when Aladdin was on the hook for Blackstone's conduct. The Merger Agreement carefully distinguishes between those entities that are parties and those that are not. The Merger Agreement itself also reflects a recognition that regulators might require the actions of non-parties in connection with approving the Merger by holding Aladdin responsible for Blackstone's willingness to take actions necessary to obtain antitrust approval.

Realizing these problems for its position, ADS's skillful advocates attempt to turn a weakness in their case into a strength. To this end, ADS argues that the specific provisions to the antitrust approval process—which are potent and impose liability on Aladdin if Blackstone fails to take any action, however extreme, necessary to secure antitrust approval—are simply an example of the uncabined obligations that Aladdin and Blackstone had as to every regulatory approval.[58] But, the clear intention of the antitrust "hell or high water" provision was to reflect an instance where much greater protection was afforded to ADS on a specific regulatory issue. The only reference in the antitrust sentence to the previous provisions is that the antitrust sentence begins with the phrase "[w]ithout limiting the foregoing." [59] Although that indicates that the antitrust sentence does not limit the effect of the general proposition in § 6.5.1, it cannot reasonably be read as broadening the plain and limited meaning of the first sentence of § 6.5.1. That first sentence requires reasonable best efforts to secure regulatory approvals only by Aladdin, and does not impose any liability on Aladdin for any refusal of Blackstone to enter agreements with regulators.[60]

---

56. Merger Agreement § 6.5.6.

57. Merger Agreement § 5.11.

58. *See* Pl.'s Ans. Br. at 22.

59. Merger Agreement § 6.5.1.

60. This argument also fails because it ignores the clear difference between the extent of the commitments Aladdin agreed to under the two sentences. In contrast to the antitrust sentence, the first sentence of § 6.5.1 only requires reasonable best efforts. Although it does not have a specific meaning, "reasonable best efforts" is, at least, clearly understood by transactional lawyers to be less than an unconditional commitment. *See, e.g.,* JAMES C. FREUND, ANATOMY OF A MERGER: STRATEGIES AND TECHNIQUES FOR NEGOTIATING CORPORATE ACQUISITIONS 289–91 (1975) (discussing when it is appropriate to use a best efforts requirement versus an absolute commitment); LOU R. KLING AND EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 13.06 (17th ed.2001) (noting that it is not clear how far a party must go to satisfy best efforts, which is a more rigorous standard than reasonable best efforts). The distinction between a "best efforts" obligations and an unconditional commitment is also reflected in

ADS is a sophisticated party that, by its own admission, was aware of the need for OCC approval of the Merger. But, it failed to secure any commitment from Aladdin that Blackstone would use any form of effort—much less reasonable best efforts—to secure OCC approval. ADS secured only commitments from Aladdin itself. Although ADS may now regret the bargain it struck, that bargain is not unclear, and this court cannot change the terms of the deal by considering parol evidence.[61] ADS only has a remedy under § 6.5.1 if Aladdin itself did not use its reasonable best efforts to secure OCC approval.

b. *ADS Does Not Allege Facts Supporting An Inference That Aladdin Failed To Exert Reasonable Best Efforts To Obtain The OCC's Approval*

ADS alleges in a conclusory manner that Aladdin did not use its reasonable best efforts to obtain OCC approval.[62] But, even though this is a motion to dismiss, ADS is only entitled to reasonable inferences of fact in its favor.[63] Although pled facts are taken as true, unsupported con-.

clusory statements are not afforded such deference.[64]

Here, ADS concedes that Aladdin itself was willing to enter into assurances of the kind the OCC was demanding. Its only complaint about Aladdin's behavior is that Aladdin did not somehow force Blackstone to agree to the OCC's demands. As just explained, Aladdin had no contractual obligation to make Blackstone exert best efforts to secure OCC approval.

The apparent reason that ADS focuses so singularly on Blackstone's non-agreement with the OCC and not on anything Aladdin failed to do is simple: the OCC communications attached to the Complaint make it clear that nothing that Aladdin could have done in isolation from Blackstone would have satisfied the OCC. Indeed, Aladdin offered to set up the ADS Fund on terms agreeable to the OCC, and to live with other stringent capital and leverage requirements which would have had the indirect effect of limiting BCP V's return on investment from its acquisition of ADS. But, the OCC continued to require

case law. *See, e.g., Coady Corp. v. Toyota Motor Distribs., Inc.*, 361 F.3d 50, 59 (1st Cir.2004) (" 'Best efforts' is implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun."). The second sentence of § 6.5.1 simply reflects a much stronger and broader commitment with respect to a discrete regulatory subject: antitrust approval. This is the exception that proves the rule: the parties knew how to create tougher obligations and how to hold Aladdin responsible for Blackstone's behavior, but ADS did not successfully negotiate for this in all circumstances. Having decided to sign an agreement that did not obligate Aladdin to do everything possible to get OCC approval or oblige Blackstone to do *anything* to that end, ADS cannot now get this court to enhance its rights because it wishes it had made a different deal.

**61.** *See United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del.Ch.2007) ("[E]x-

trinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."); *see also DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del.Ch. Jan.23, 2006) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not.").

**62.** Compl. ¶ 68.

**63.** *White v. Panic*, 783 A.2d 543, 549 (Del. 2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 253 (Del.2000)).

**64.** *AIG Ret. Servs., Inc. v. Barbizet*, 2006 WL 1980337, at *3 (Del.Ch. July 11, 2006) ("Conclusory statements, without supporting factual averments, will be disregarded for the purposes of defendants' 12(b)(6) motion to dismiss.").

that the Blackstone Group and twelve of its affiliates make a commitment, and thus Aladdin was unable to get the consent on its own.

Despite the fact that it has not provided any reason to believe that Aladdin had any power to compel Blackstone, ADS argues that it is a question of fact as to whether Aladdin used its reasonable best efforts because other courts have interpreted this issue as a question of fact. But, under Delaware law, the actual meaning of the Merger Agreement is a question of law.[65] And, although I must grant ADS the benefit of rational inferences, I need not accept its conclusory allegations. ADS's only gripe is with the fact that Blackstone did not agree to what the OCC proposed. Without pleading any facts to support the inference that Aladdin had the contractual duty to cause Blackstone to agree to the OCC's demands, Blackstone's inaction does not constitute a failure to act on Aladdin's part. As a result, the Complaint fails to allege any failure by Aladdin itself to use reasonable best efforts to secure OCC approval, and ADS has failed to state a claim for breach of § 6.5.1 of the Merger Agreement.[66]

### 2. ADS Has Not Stated A Claim That Aladdin Breached Its Obligations Under § 6.5.6

■ As we have seen, § 6.5.1 of the Merger Agreement was an affirmative covenant pledging that Aladdin would use its own reasonable best efforts to secure OCC approval. That covenant did not require Aladdin to cause Blackstone to undertake any effort at all toward that end. As an answer to this difficult dilemma for itself, ADS has seized on a different section of the Merger Agreement: § 6.5.6, a negative covenant, which holds Aladdin responsible if Blackstone takes certain actions. This provision states, in its entirety, that:

> Except as expressly contemplated by this Agreement, neither [Aladdin Solutions] nor [Aladdin Merger Sub] shall, and each of [Aladdin Solutions] and [Aladdin Merger Sub] shall cause each member of the Parent Group not to, take or cause or permit to be taken any action (including the acquisition of businesses or assets) which would reasonably be expected to prevent or materially impair or delay the consummation of the transactions contemplated by this Agreement.[67]

This covenant is plainly limited to keeping Blackstone from acting in an affirmative way to prevent, impair, or delay the closing of the Merger. In this sense, it is distinct from § 6.5.1. Section 6.5.1 was an affirmative covenant obligating Aladdin to use reasonable best efforts to obtain regulatory approval, whereas § 6.5.6 was a negative covenant directed toward making sure that Aladdin and its Parent Group did not take affirmative action designed to thwart the closing of the Merger.

ADS fails to identify any affirmative step Blackstone took that impeded the Merger's closing in any way. Rather, it complains about what Blackstone did not do, which was to agree with the OCC's demands. ADS attempts to convert this inaction into an affirmative, impeding act

---

**65.** See Majkowski v. Am. Imaging Mgmt. Servs., LLC, 913 A.2d 572, 581 (Del.Ch.2006) ("Under Delaware law, the proper interpretation of language in a contract is a question of law.").

**66.** See NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, 159 A.D.2d 902, 553 N.Y.S.2d 864, 867 (N.Y.App.Div.1990) (dismissing claim for breach of a best efforts clause on a motion to dismiss), appeal dismissed, 76 N.Y.2d 886, 561 N.Y.S.2d 546, 562 N.E.2d 871 (N.Y. 1990).

**67.** Merger Agreement § 6.5.6.

by phrasing Blackstone's inaction in affirmative terms, for example, that Blackstone was "rejecting proposals" by failing to accept the OCC's demands.[68] ADS also tries to punish Blackstone for even engaging with the OCC by contending that Blackstone did not show good faith in its negotiations with the OCC.[69] But, of course, Blackstone had no obligation to engage with the OCC at all. At bottom, the only genuine argument that ADS raises about Blackstone's good faith is that Blackstone, for its own business reasons, concluded that accepting the OCC's terms was not in its own financial best interests.

■ These allegations are not the stuff of which a violation of a negative covenant like § 6.5.6 is made. By its clear terms, § 6.5.6 is only concerned with preventing Blackstone from acting to impede the Merger's closing. ADS itself admits as much, noting that "[s]ection 6.5.1 defines the scope of what actions Aladdin must take or cause others to take .... [s]ection 6.5.6 identifies actions Aladdin must not take and must prevent the Blackstone Parent Group from taking."[70] This tracks a generally acknowledged distinction in merger agreements between affirmative and negative covenants: affirmative covenants require that a bound party take action while negative covenants forbid action.[71]

Because liability under a negative covenant can only arise from an action, Blackstone's refusal to consent to the OCC Proposal is not a violation of a negative covenant. ADS's creative rephrasing of Blackstone's negative response to the OCC's demands for affirmative action does not change this reality.[72] "Rejecting" the OCC Proposal is the same thing as not agreeing to that Proposal.

To read § 6.5.6 as ADS contends would not only distort its plain meaning, it would override the carefully negotiated provision of the Merger Agreement dealing with the parties' duties to take certain affirmative actions necessary to secure regulatory approval: § 6.5.1. If, as ADS contends, § 6.5.6 requires Aladdin and Blackstone not to "refuse" any OCC demand necessary to get regulatory approval, what is the need for § 6.5.1? And, why the limitations on Aladdin's responsibilities under § 6.5.1? Section 6.5.1 limits Aladdin to

68. Compl. ¶ 68.

69. *See id.*

70. Pl.'s Ans. Br. at 31 n. 11.

71. *See Energy Partners, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *13 (Del.Ch. Oct.11, 2006) (interpreting a covenant similar to § 6.5.6 as promising "not to take certain types of actions before the closing" without consent); BLACK'S LAW DICTIONARY 391 (8th ed.2004) (defining an affirmative covenant as "[a] covenant that obligates a party to do some act"); *id.* at 392 (defining a negative covenant as "[a] covenant that requires a party to refrain from doing something"); FREUND, *supra* note 60, at 286 (noting that merger agreements generally contain: "(i) negative covenants that restrict the seller (and sometimes the purchaser) from taking certain

actions prior to closing without the consent of the purchaser (or seller, if applicable), and (ii) affirmative covenants that obligate one or both of the parties to take certain action"); *see also* COMMITTEE ON NEGOTIATED ACQUISITIONS, THE M & A PROCESS: A PRACTICAL GUIDE FOR THE BUSINESS LAWYER 229 (2005) (noting that pre-closing covenants about the operation of the business generally include affirmative covenants and negative covenants); Robert M. Davis, *Purchase Agreements, in* MERGERS AND ACQUISITIONS 246, 258–59 (Jim McCord ed.1969) (explaining the difference between affirmative and negative covenants).

72. For example, ADS contends that Blackstone's alleged failure to respond to certain OCC requests for information was an affirmative impeding act. But, the Merger Agreement imposed no duty on Blackstone to engage with the OCC at all.

using "reasonable best efforts," while § 6.5.6 contains no qualifying language. And § 6.5.1, of course, clearly omits any requirement that Aladdin be held responsible for any lack of affirmative effort on Blackstone's part to get OCC approval, while simultaneously holding Aladdin responsible if Blackstone did not honor a "hell or high water" obligation to clear antitrust approval. Given that § 6.5.1 clearly covers the affirmative obligations of the parties in the regulatory context, it disrupts the sensible structure of the Merger Agreement to read § 6.5.6 as being other than what it purports to be: a negative covenant that has the limited and complementary purpose of prohibiting parties from taking affirmative action with the likely effect of impeding the Merger's closing.

Put simply, § 6.5.1 of the Merger Agreement makes clear that Aladdin had no contractual responsibility to make Blackstone do anything affirmative to obtain OCC approval. Section § 6.5.6 does not override that, and Blackstone's refusal to assent to the OCC's demands was not an affirmative act impeding the Merger in the sense prohibited by the negative covenant contained in § 6.5.6. ADS has thus failed to state a claim for breach of § 6.5.6.

3. *Aladdin Did Not Breach The Merger Agreement By Representing That It Controls Blackstone*

■ ADS also asserts that Aladdin breached the Merger Agreement by falsely representing that it had the power to control Blackstone. To do so, ADS seizes upon the fact that Aladdin agreed to make Blackstone act or prevent Blackstone from acting in provisions like the antitrust sentence of § 6.5.1 or the negative covenant in § 6.5.6. ADS argues that these provisions, combined with Aladdin's representation in

§ 5.2 that it had the power necessary to complete the Merger, indicate that Aladdin somehow represented that it controlled Blackstone, when all the parties knew that the reverse was true: Blackstone controlled Aladdin. This argument fails because it misconstrues what Aladdin said it could do. Aladdin only represented that it could make Blackstone behave in the specific and narrow ways that it promised, not that it had unlimited control to make Blackstone and all of its affiliates do whatever Aladdin wished.

ADS's argument here turns on Aladdin's representation that:

> Each of [Aladdin Solutions] and [Aladdin Merger Sub] has all necessary corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions provided for herein. The execution and delivery of this Agreement, by each of [Aladdin Solutions] and [Aladdin Merger Sub], and the consummation by [Aladdin Solutions] and [Aladdin Merger Sub] of the transactions provided for herein have been duly and validly authorized by all necessary corporate action on the part of [Aladdin Solutions] and [Aladdin Merger Sub], and no other corporate proceedings on the part of [Aladdin Solutions] or [Aladdin Merger Sub] and no vote of [Aladdin Solutions'] stockholders are necessary to authorize this Agreement or to consummate the transactions provided for herein.[73]

ADS says that § 5.2, when read in light of other provisions in the Merger Agreement that recognize the necessity for Blackstone to take certain steps in connection with the Merger approval process, must be read as a general representation that Aladdin had the power to control Blackstone and cause

---

**73.** Merger Agreement § 5.2.

it to do anything reasonably necessary to secure approval of the Merger.

That is a strained argument that distorts the plain meaning of a common term in acquisition agreements.[74] The essence of § 5.2 is that Aladdin has the power to do what *it* says *it* will do. In this case, the operative language is "all necessary corporate power and authority ... to perform *its* obligations hereunder and to consummate the transactions provided for herein."[75] In making that representation, Aladdin only represents it has the power to do what it promises to do in the Merger Agreement.

As detailed previously, when Aladdin was willing to be held accountable for the actions of Blackstone, the parties detailed that specifically in the Merger Agreement. For example, Aladdin promised to keep Blackstone from issuing a press release in certain circumstances,[76] and to cause Blackstone to divest itself of certain assets to obtain antitrust approval.[77] But, the fact that Aladdin was willing to be held responsible in specific situations for Blackstone's behavior provides no rational basis for reading § 5.2 as a general assurance that Aladdin had the power to make Blackstone do anything it wished. Aladdin only contracted that it had the ability to prevent Blackstone from acting or to cause Blackstone to act in a small number of carefully defined ways.

The Merger Agreement specifically defines Aladdin's "Parent Group" precisely to clarify those situations when Aladdin was responsible for the Parent Group's actions.

Reading § 5.2 as silently embodying a contractual promise by Aladdin that it would guarantee that the Parent Group (i.e., Blackstone) would take any action required of Aladdin itself would undermine all the careful work the parties did in specifically articulating those situations when Aladdin was responsible for Blackstone's behavior. Put simply, if Aladdin had the contractual duty to make Blackstone do everything Aladdin itself was bound to do, then Blackstone would not have been defined as part of a "Parent Group," and there would have been no need for specific provisions discussing Aladdin's responsibility for Blackstone's behavior in certain contexts.

In its arguments, ADS has made much of the alleged fact that Blackstone and Aladdin are both controlled by Stephen Schwarzman, the CEO of the Blackstone Group.[78] For purposes of this motion, one can assume that Schwarzman has substantial influence over Blackstone and could have caused it to do what the OCC wished, if that was in Blackstone's interest. But, ADS is not entitled to a remedy by proving that mundane reality. ADS knew, as the plain terms of the Merger Agreement show, that it was not striking a deal with the Blackstone Group, BCP V, or Schwarzman. ADS was doing a deal with Aladdin. ADS is only entitled to what it was promised from the entities that made those promises. The issue is not one of Blackstone's or Schwarzman's power; it is whether Blackstone or Schwarzman had any contractual duty to ADS, and the answer is clearly that they did not. Like-

74. *See* KLING & NUGENT, *supra* note 60, § 12.03[1] ("In the Authors' experience ... the Buyer will generally represent to the Seller ... as to due authorization to consummate the transaction"); COMMITTEE ON NEGOTIATED ACQUISITIONS, *supra* note 52, § 4.2 (containing a similar representation).

75. Merger Agreement § 5.2 (emphasis added).

76. Merger Agreement § 6.7.

77. Merger Agreement § 6.5.1.

78. Defs.' Ans. Br. at 23.

wise, the issue is not whether Schwarzman had sufficient managerial power to cause Blackstone to act at the OCC's behest; the question is whether Aladdin had any duty to cause Blackstone to act to meet the OCC's demand, or any liability if Blackstone chose not do so. The answer to this question is also clear: Aladdin did not.

■ A huge amount of wealth generation results from the use of distinct entities by corporate parents to conduct business. This allows parents to engage in risky endeavors precisely because the parents can cabin the amount of risk they are undertaking by using distinct entities to carry out certain activities. Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise.

To follow this traditional practice here works no unfairness to ADS. ADS knew with whom it was contracting and with whom it was not. The bottom line for ADS is that it only contracted with Aladdin, and in § 5.2 simply got an assurance that Aladdin had the authority and power to do all that *it* was required to do under the Merger Agreement. ADS has made no allegation that Aladdin lacked such power as to its own duties. The fact that ADS wishes it had struck a bargain with Blackstone directly does not change the reality that ADS knew that the Merger Agreement did not impose obligations on Blackstone directly. ADS has not stated a

claim for breach of § 5.2 of the Merger Agreement.[79]

## C. A Reading Of The Entirety Of The Merger Agreement Does Not Support A Finding That Aladdin Breached The Agreement

■ In a brief snippet of its answering brief, ADS argues that, even if nothing in the Merger Agreement actually obligated Aladdin to somehow force its parent to agree to the OCC Proposal, the overall plan of that Agreement shows that the parties intended to bind Blackstone to use its best efforts to obtain OCC approval. But, while it is true that in interpreting a contract "a court must construe the agreement as a whole,"[80] a reading of the Merger Agreement reveals no intention to force Blackstone to act. The Merger Agreement is a highly negotiated document that stretches over almost seventy, single-spaced pages. It carefully distinguishes between situations when the parties alone had obligations and situations when the parties would be responsible for conduct of their affiliates. Most notably, ADS successfully got Aladdin to make itself liable if Blackstone did not do whatever it could to get antitrust approval. But, ADS did not get Aladdin to make any promises about what Blackstone would do to get the OCC's approval. That is the bargain that ADS made, and its attempt to introduce extrinsic evidence to contradict the plain terms of the Merger Agreement is not permitted by the contract law of this state.[81]

**79.** For the first time at oral argument, ADS attempted to base a breach of contract claim on § 6.5.3 of the Merger Agreement. But, as ADS never claimed liability based on this section in the Complaint or briefing, that argument was waived and was not fairly presented. *See Emerald Partners v. Berlin,* 726 A.2d 1215, 1224 (Del.1999) ("Issues not briefed are deemed waived.").

**80.** *E.I. du Pont de Nemours,* 498 A.2d at 1113 (Del.1985) (citing *State v. Dabson,* 217 A.2d 497 (Del.1966); *Bamdad Mech. Co. v. United Techs. Corp.,* 586 F.Supp. 551 (D.Del.1984)).

**81.** *Eagle Indus.,* 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to

### D. Aladdin Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing

For similar reasons, I reject an argument that ADS introduced in another small part of its answering brief, which is that, even if there is nothing in the Merger Agreement which obligates Aladdin to make Blackstone agree to the OCC Proposal, this court should use the covenant of good faith and fair dealing to read such a commitment into the Merger Agreement.

The implied covenant is a backstop and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[82] But, it is not an exception to the rule that courts will not alter the terms of a bargain sophisticated parties entered into willingly because a party now regrets the deal.[83] As a result, the implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract.[84] Here, the Merger Agreement has a carefully negotiated provision that only makes Aladdin responsible for making sure that it uses *its* reasonable best efforts to secure OCC approval. This provision clearly does not make Aladdin responsible for causing Blackstone to help secure OCC approval. To imply such an obligation on Aladdin's part would not vindicate an expectation clearly signaled by the express terms of the Merger Agreement; instead, it would impose an after-the-fact obligation on Aladdin that ADS was unable to obtain in the contractual negotiations and contradict the plain terms of the Merger Agreement. Thus, ADS has not stated a claim that Aladdin breached the implied covenant of good faith and fair dealing.

### IV. Conclusion

For the foregoing reasons, the Amended Verified Complaint is dismissed in its entirety. IT IS SO ORDERED.

create an ambiguity." (citing *Pellaton*, 592 A.2d at 478; *Citadel*, 603 A.2d 818)).

**82.** *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch. 1985)).

**83.** *See DeLucca*, 2006 WL 224058, at *2 ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not.").

**84.** *See Allied Capital*, 910 A.2d at 1035 (holding that a plaintiff "cannot use the implied covenant of good faith and fair dealing to avoid the consequences of the plain language of the contract"); *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del.Ch.1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play." (citing *Williams Natural Gas Co. v. Amoco Prod. Co.*, 1991 WL 58387 (Del.Ch. Apr.16, 1991)); *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1143 (Del.1990)), *aff'd*, 609 A.2d 668 (Del.1992).