## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFF HIMAWAN, JOSH TARGOFF and STEPHEN TULLMAN, as the duly-appointed Representatives of the former stockholders of CEPTION THERAPEUTICS, INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0075-SG |
| CEPHALON, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., and TEVA PHARMACEUTICALS USA, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 21, 2018
Date Decided: December 28, 2018

Richard L. Renck and Oderah C. Nwaeze, of DUANE MORRIS LLP, Wilmington, Delaware; OF COUNSEL: John J. Soroko, Wayne A. Mack, Jessica Priselac, and Joseph J. Pangaro, of DUANE MORRIS LLP, Philadelphia, Pennsylvania, *Attorneys for the Plaintiffs*.

Kevin Shannon and J. Matthew Belger, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Jay P. Lefkowitz, Matthew Solum, Shireen A. Barday, Amanda B. Elbogen, and Z. Payvand Ahdout, of KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for the Defendants*.

GLASSCOCK, Vice Chancellor

An antibody is a protein that allows an organism's immune system to overcome disease-causing pathogens. Science has identified numerous antibodies that are or may be useful in fighting human diseases. As with new drugs, the process of bringing antibodies to market, it appears, is long, arduous, and risky. Rigorous governmental oversight for risk and efficacy, in both the United States and in Europe, requires a significant investment of time and effort on the part of an entity seeking to monetize potentially beneficial antibodies. The Plaintiffs here are representatives of former stockholders of a company, Ception, that owned rights to such an antibody. It was purchased by another entity, Cephalon; like Ception, a Delaware corporation. The parties to that sale attempted to allocate the risk of the development of the antibody among the parties. The resulting merger agreement provided an initial sales price, together with earn-outs to be paid to the sellers by the buyer. Those earn-outs were payable upon the meeting of certain milestones in the approval of the antibody to treat two different conditions, in both Europe and the United States. The buyer agreed to use commercially reasonable efforts to develop the antibody and achieve the milestones.

This matter involves the sellers' contention that the buyer's efforts, which have been abandoned with respect to development of the antibody to treat one of the medical conditions upon which earn-outs depend, were not commercially reasonable. The sellers argue that this breached the merger agreement, and seek

1

damages from the buyer and its affiliates. This Memorandum Opinion concerns the Defendants' Motions to Dismiss for failure to state a claim. In short, the Defendants argue that the Complaint is inadequate, because, per the Defendants, it is entirely conclusory as to their failure to use commercially reasonable efforts.

Ultimately, the Plaintiffs here face a difficult matter of proof. The merger agreement leaves discretion on how to pursue development of the antibody with the buyer. It is, perhaps, unlikely that the buyer failed to use commercially reasonable efforts to develop the antibody, given the buyer's financial interest in monetizing the antibody. However, here the parties have defined "commercially reasonable efforts" as "the exercise of such efforts and commitment of such resources by a company with substantially the same resources and expertise as [the buyer], with due regard to the nature of efforts and cost required for the undertaking at stake."[1] This rather inartful draftsmanship appears to create a standard based on the effort that companies similarly situated in the market employ, or would employ. The Plaintiffs, in the Complaint, point to other companies and their efforts to develop similar medical treatments, as exemplars against which the Defendants efforts fall short. In briefing, the Defendants point to dissimilarities between the buyer and its products, and the exemplars and their products. These dissimilarities, according the Defendants, render the Plaintiffs' exemplars contractually irrelevant. That may ultimately prove

---

[1] Compl. ¶ 74.

2

true. At the pleadings stage, however, I must employ plaintiff-friendly inferences, consonant with which I find that the Defendants have only identified factual issues that may be resolved when a record is created. The Plaintiffs have stated a claim for breach of contract, and the Motion to Dismiss that claim is denied. However, other ancillary claims must be dismissed. My reasoning follows.

## I. BACKGROUND

The Plaintiffs, Jeff Himawan, Josh Targoff, and Stephen Tullman, are appointed representatives of the former stockholders of Ception Therapeutics, Inc. ("Ception").[2] Ception was acquired by Defendant Cephalon, Inc. ("Cephalon") in February 2010.[3] Both companies were organized under Delaware law.[4] The merger agreement governing that acquisition forms the basis of this litigation. Later, in October 2011, Cephalon itself was acquired by Defendant Teva Pharmaceutical Industries Ltd. ("Teva Ltd."), an Israeli company that lists its principal place of business in Petah Tikva,[5] Israel.[6] Teva Ltd. has filed a Motion to Dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6).[7] Cephalon and Defendant Teva Pharmaceuticals

---

[2] *Id.* ¶¶ 20–23.
[3] *Id.* ¶ 71.
[4] *Id.* ¶¶ 19, 24.
[5] And not Beit Hatikva, Israel, which, I note, is spelled with a "B."
[6] Compl. ¶¶ 26, 77.
[7] *See* Def. Teva Ltd. Mot. to Dismiss.

USA, Inc. ("Teva USA"), a Delaware corporation and a wholly owned subsidiary of Teva Ltd.,[8] have also filed a Motion to Dismiss under Rule 12(b)(6).[9]

On a Rule 12(b)(6) motion to dismiss, the Court must assume as true all well-pleaded allegations of fact in the complaint, and accept as true all inferences that can be reasonably drawn in favor of the plaintiff from those well-pleaded allegations of fact.[10] The Court does not normally consider documents extrinsic to the complaint, with the exception of "documents[s] integral to a plaintiff's claim and incorporated into the complaint."[11] As a result, the factual background that follows relies only on the Plaintiffs' Complaint, which this Court accepts as true for purposes of the motions before it.

*A. Ception Acquires the Rights to "RSZ" and Pursues a Sale*

In 2004, Plaintiff Stephen Tullman and others formed Ception,[12] and through Ception they licensed the rights to Rezlizumab ("RSZ"), an antibody.[13] Ception sought to develop and commercialize RSZ as a treatment for eosinophilic asthma ("EA") and for eosinophilic esophagitis[14] ("EoE").[15] Ception took such steps as

---

[8] Compl. ¶¶ 9, 24, 27.
[9] *See* Defs. Cephalon and Teva USA Mot. to Dismiss.
[10] *LeCrenier v. Cent. Oil Asphalt Corp.*, 2010 WL 5449838, at *3 (Del. Ch. Dec. 22, 2010).
[11] *Orman v. Cullman*, 794 A.2d 5, 15–16 (Del. Ch. 2002).
[12] Compl. ¶ 19.
[13] To be precise, RSZ is an "anti-interleukin 5 monoclonal antibody." *Id.* ¶ 3.
[14] "EoE is a chronic disorder of the digestive system in which large numbers of a particular type of white blood cells called eosinophils are present in the esophagus." *Id.*
[15] *Id.* ¶ 42.

qualifying RZA for certain Food and Drug Administration ("FDA") development programs,[16] submitting data to the FDA,[17] and gaining FDA approval for clinical trials of RZA.[18] Ception designed three clinical trials, two trials for the treatment of EoE and one trial for the treatment of EA.[19] The EA clinical trial and one EoE clinical trial were designed to measure improvements in defined endpoints (an "endpoint study").[20] The other EoE clinical trial was an "open label extension study" and was designed to measure long term safety and efficacy of RSZ,[21] whereby, after the completion of the EoE endpoint study, its participants would be invited to continue receiving RZA.[22]

In 2008, after the FDA had approved the clinical trials, but before Ception began conducting them, Ception was approached separately by Wyeth Pharmaceuticals, Inc. and Cephalon to conduct a sale.[23] In January 2009, Ception entered into an option agreement with Cephalon (the "Option Agreement").[24] Under the Option Agreement, Cephalon paid $100 million for the option to acquire Ception

---

[16] Such as the Orphan Drug Designation Program, which provided incentives to develop drugs for rare diseases. *See id.* ¶¶ 43–46.
[17] *Id.* ¶ 48.
[18] *Id.*
[19] *Id.* ¶ 47.
[20] The EA endpoint study had one endpoint, improvement in the participant's responses to an asthma questionnaire. *Id.* ¶ 51. The EoE endpoint study had two endpoints, changes in the participant's esophageal eosinophil levels and changes in physicians' assessments of the participants. *Id.* ¶ 49.
[21] *Id.* ¶¶ 49–51.
[22] *Id.* ¶ 86.
[23] *Id.* ¶ 52.
[24] *Id.* ¶ 57.

for a further $250 million.[25] The prospective acquisition would be made pursuant to a pre-agreed form of merger agreement, which included potential milestone payments to Ception stockholders totaling $550 million; the milestone payments, in large part, related to the development and commercialization of RZA by Cephalon.[26] As part of the Option Agreement, Cephalon also loaned Ception $25 million to help conduct the clinical trials.[27] The exercise period for Cephalon's option to purchase Ception was tied to the completion of the EoE endpoint study.[28]

*B. The Merger of Ception and Cephalon*

The EoE endpoint study was completed in October 2009; the study met one of its two endpoints.[29] The completion of the study triggered the exercise period for Cephalon's option to acquire Ception.[30] However, Ception agreed to extend the exercise period until after the EA endpoint study was also concluded.[31] The EA endpoint study was completed in February 2010; the study missed its only endpoint.[32] With knowledge of both studies, Cephalon decided to exercise its option

---

[25] *Id.* ¶ 58.
[26] *Id.* ¶¶ 59, 60.
[27] *Id.* ¶ 62.
[28] *Id.* ¶ 58. According to the Option Agreement, Cephalon had fifteen days to exercise its option to purchase Ception after being notified that the EoE endpoint study had met its endpoints, or thirty days if the endpoints had not been met. *Id.*
[29] *Id.* ¶¶ 64–66.
[30] Under the option agreement, as the EoE endpoint study had not met both its endpoints, Cephalon had thirty days after the conclusion of the EoE endpoint study to decide whether to exercise the option. *Id.* ¶ 68.
[31] *Id.*
[32] *Id.* ¶ 69.

to acquire Ception, pursuant to an amended version of the form of merger agreement (the "Merger Agreement").[33]

Under the Merger Agreement, Cephalon would pay Ception stockholders $250 million at closing.[34] Following closing, Cephalon would pay up to $550 million in milestone payments to the now-former stockholders of Ception.[35] The milestone payments (the "Milestones") were: (A) $150 million for FDA approval of RSZ as treatment for EoE, (B) $50 million for the European Commission's grant of marketing authorization of RSZ for the treatment of EoE, (C) $50 million for the completion of the EA endpoint study,[36] (D) $150 million for FDA approval of any asthma indication for RSZ, (E) $50 million for the European Commission's grant of marketing authorization of RSZ for the treatment of any asthma indication, and (F) $100 million for FDA approval of an Oral Anti-TNF Product.[37]

The development and monetization of new medical treatments involves substantial risk, risk the parties attempted to allocate by their agreement. As laid out

---

[33] *Id.* ¶¶ 71, 72.

[34] *Id.* ¶ 73.

[35] *Id.*

[36] The only notable difference between the form of merger agreement in the Option Agreement and the Merger Agreement was a change in the definition of the milestone payment related to the EA endpoint study. As discussed, the exercise period for the option was extended to allow Ception to complete the EA endpoint study, and the study was thus completed before the Merger Agreement. The change in definition effectively eliminated the $50 million milestone payment envisioned in the form of merger agreement for completion of the EA endpoint study. *Id.* ¶¶ 72, 73.

[37] *Id.* ¶ 73. The "Oral Anti-TNF Product" is unrelated to RSZ, and is otherwise not defined in the record. *Id.* ¶ 60.

above, the initial payment to Ception stockholders was relatively modest, while a large part of the purchase price was contingent on the success of RSZ. To recapitulate, RSZ was seen as a potential treatment for two conditions, a type of asthma, EA, and an inflammation of the esophagus, EoE. In the Merger Agreement, Cephalon agreed if certain Milestones related to RSZ as a treatment for those two conditions were reached, it would pay former stockholders of Ception additional lump sums. If RSZ was approved as a treatment *for EoE* by both the FDA and the European Commission, then Cephalon would pay former stockholders of Ception a total of $200 million, according to Milestones (A) and (B). If RSZ was approved as a treatment *for EA* by both the FDA and the European Commission, then Cephalon would pay former stockholders of Ception a total of $200 million, according to Milestones (D) and (E).

According to Section 3.4(a)(iii) of the Merger Agreement, Cephalon was required to use "commercially reasonable efforts to develop and commercialize (or cause the development and commercialization of) [RSZ] so as to achieve the Developmental Milestones set forth in clauses (A) through (E);" these are Milestones (A)-(E) referenced above.[38] "Commercially reasonable efforts" was defined "for purposes of . . . Section 3.4" as "the exercise of such efforts and commitment of such resources by a company with substantially the same resources

---

[38] *Id.* ¶ 74.

8

and expertise as Parent, with due regard to the nature of efforts and cost required for the undertaking at stake."[39]

Under Section 3.4(c) of the Merger Agreement, "(i) . . . control of the Surviving Corporation . . . shall rest with Parent . . . and the [former stockholders] shall have no right object to the manner in which business of the Surviving Corporation is conducted . . . and (ii) Parent shall have complete discretion with respect to all decisions related to the business of the Surviving Corporation . . . ."[40] The Merger Agreement was signed on March 10, 2010.[41]

*C. Cephalon's Post-Merger Efforts and the Acquisition of Cephalon by Teva Ltd.*

In May 2011, Teva Ltd. announced it was acquiring Cephalon at an enterprise value of $6.8 billion.[42] Teva Ltd. completed its acquisition of Cephalon in October 2011, and Cephalon became a wholly owned subsidiary of Teva Ltd.[43] After the acquisition, Tullman met with Teva leadership[44] more than a dozen times between 2012 and 2016 to discuss the development and commercialization of RSZ,[45]

---

[39] *Id.*
[40] *Id.* ¶ 75.
[41] The Complaint does not actually provide the date the merger was closed, only that Cephalon decided to exercise its option to buy Ception in February 2010. *Id.* ¶ 71. However, the Merger Agreement, which is dated March 10, 2010, was incorporated into the Complaint. *Id.* at Ex. A.
[42] *Id.* ¶ 77.
[43] *Id.*
[44] The Complaint does not distinguish between Defendants Teva Ltd. and Teva USA in this regard; presumably, then, the Plaintiffs refer to leadership of both entities. *See id.* ¶ 99.
[45] *Id.*

including for the treatment of EoE.[46]  In 2015, Teva Ltd. acquired Allergan Generics in a transaction valued at $40.5 billion; Teva Ltd. announced that as a result of the transaction it "planned for 1,500 generic launches globally in 2017."[47]

Cephalon and Teva[48] continued to develop and commercialize RZA for EA;[49] in March 2016, Teva Ltd. announced FDA approval for RZA as a treatment for EA;[50] and in August 2016, Teva Ltd. received approval from the European Commission to market RSZ as an EA treatment.[51]  These were Milestones (D) and (E) of the Merger Agreement.  Teva USA made the related Milestone payments to the former stockholders of Ception,[52] totaling $200 million.

When Teva Ltd. acquired Cephalon, the EoE open label extension study was ongoing.[53]  Data collection for the study was substantially completed in January 2012, but Cephalon did not immediately submit the results to the FDA.[54]  In 2012, Congress passed the Food and Drug Safety and Innovation Act ("FDSIA"), which created new development programs for certain types of drugs; Cephalon did not

---

[46] *Id.* ¶ 100.
[47] *Id.* ¶¶ 104, 105.
[48] The Complaint again does not distinguish between Defendants Teva Ltd. and Teva USA in this regard; presumably, then, both entities worked to develop and commercialize RZA for EA. *See id.* ¶ 78.
[49] *Id.*
[50] *Id.* ¶ 81.
[51] *Id.* ¶ 82.
[52] *Id.* ¶ 84.
[53] *Id.* ¶¶ 50, 63, 85.
[54] *Id.* ¶ 92.

attempt to designate RSZ as a treatment for EoE under any of these new programs.[55]

One of the researchers who helped conduct the EoE open label extension study continued to use RSZ to treat patients with EoE; and in February and March 2016 the researcher independently published and presented positive results for RSZ as a treatment for EoE.[56] In March 2016, Cephalon and Teva Ltd. submitted the results of the EoE open label extension study to the FDA, although not all the data collected was submitted.[57]

On October 10, 2016, Plaintiff Himawan wrote to Francine Del Ricci, then a Senior Vice President at Teva USA,[58] and specifically asked about Cephalon's and Teva Ltd.'s efforts to commercialize and develop RSZ as a treatment for EoE.[59] Del Ricci replied on November 3, 2016.[60] Del Ricci wrote, in pertinent part:

> Cephalon has the obligation under its March 10, 2010 Merger Agreement with Ception to use commercially reasonable efforts to develop and commercialize [RSZ]. However, the Merger Agreement goes on to provide that Cephalon will have "complete discretion with respect to all decisions relating to the research, development, manufacture, marketing, pricing and distribution of [RSZ] . . . and shall have no obligation to conduct clinical trials related to, or otherwise pursue regulatory approvals of, any indication for [RSZ] . . . or otherwise take any action to protect, attain or maximize any payment

---

[55] *Id.* ¶¶ 111, 112.
[56] *Id.* ¶¶ 96–98.
[57] *Id.* ¶¶ 92–94.
[58] Tullman had previously corresponded with Del Ricci in 2013 about RSZ. Del Ricci's position at that time was Vice President of Corporate Alliance Management & Pipeline Governance at Teva USA. *Id.* ¶ 102.
[59] *Id.* ¶ 106.
[60] *Id.* ¶ 106; *id.* at Ex. C.

to be received by the holders of Stock Certificates and Stock Agreements pursuant to this Section 3.4."

In any event, it would not be commercially reasonable for Cephalon to develop [RSZ] for [EoE] for numerous reasons, including the need to commit substantial resources that such an undertaking would require in light of other ongoing development and portfolio-building initiatives of the company.[61]

In other words, Del Ricci revealed that Cephalon had abandoned its efforts to develop and commercialize RSZ as a treatment for EoE.[62] Pharmaceutical companies Shire,[63] Sanofi and Regeneron,[64] Celgene,[65] and GlaxoSmithKline,[66] have substantially similar resources and expertise to Cephalon and are currently pursuing products for treatment of EoE.[67]

*D. Procedural History*

The Plaintiffs filed the Complaint in this action on February 1, 2018. Cephalon and Teva USA filed a Motion to Dismiss on February 28, 2018. Teva Ltd.

---

[61] Rather than reproduce the segments of Del Ricci's response provided in the Complaint, I have reproduced a fuller response, which was incorporated into the Complaint. *Id.* at Ex. C; *see id.* ¶¶ 106, 107.

[62] *Id.* ¶ 17.

[63] Shire has received FDA Breakthrough Therapy designation for its EoE treatment, which is currently in a Phase III clinical trial. *Id.* ¶ 109a.

[64] Sanofi and Regeneron are planning Phase III trials for their EoE treatment in 2018. *Id.* ¶ 109b.

[65] Celgene has completed a Phase II trial for its EoE treatment and is currently conducting an open label extension study. *Id.* ¶ 109c.

[66] GlaxoSmithKline has received FDA approval for "Nucala" to "treat eosinophilic granulomatosis with polyangiitis" and is now seeking FDA "approval of Nucala as an add on treatment for patients who have COPD with an eosiniphilic phenotype." *Id.* ¶ 109d.

[67] *Id.* ¶ 109.

filed a Motion to Dismiss on April 10, 2018. I heard oral argument on both Motions to Dismiss on September 21, 2018.

## II. LEGAL ANALYSIS

The Plaintiffs bring a breach of contract claim against Defendant Cephalon, alleging that by abandoning efforts to develop and commercialize RSZ as a treatment for EoE, Cephalon breached the Merger Agreement. The Plaintiffs also bring a claim for breach of implied covenant of good faith and fair dealing against Cephalon, to the extent Cephalon's conduct is not covered by the Merger Agreement. Finally, the Plaintiffs bring a tortious interference with contract claim against Defendants Teva USA and Teva Ltd., arguing that they intentionally interfered with Cephalon's ability to meet its obligations under the Merger Agreement. The Plaintiffs seek, among other things, monetary relief in the amount of the Milestone payments related to EoE and a grant of the rights to RSZ.[68]

In response, the Defendants have filed Motions to Dismiss all of the claims brought by the Plaintiffs. Cephalon argues, pursuant to Rule 12(b)(6), that the Plaintiffs failed to state a claim that Cephalon breached the Merger Agreement; specifically, that the Plaintiffs did not sufficiently plead that Cephalon failed to use "commercially reasonable efforts." Cephalon also argues, under Rule 12(b)(6), that the Plaintiffs failed to state a claim for breach of implied covenant of good faith and

---

[68] *Id.* ¶¶ 38–39.

13

fair dealing because there was no room in the Merger Agreement for such an implied covenant and, in any event, there was no bad faith. Teva Ltd. argues, pursuant to Rule 12(b)(2), that it should be dismissed from this action because Teva Ltd., an Israeli company, is not subject to personal jurisdiction in Delaware. Teva USA and Teva Ltd. argue, pursuant to Rule 12(b)(6), that the Plaintiffs made only conclusory allegations that Teva USA and Teva Ltd. "direct[ed] Cephalon to abandon . . . RSZ for EoE," and that therefore the Plaintiffs failed to state a claim for tortious interference with contract.[69] Finally the Defendants together argue that all claims against them should be dismissed because the Plaintiffs acquiesced and the Defendants relied on the Plaintiffs' apparent consent to their efforts to develop RSZ. I begin with Cephalon's Motion to Dismiss.

*A. Cephalon's Rule 12(b)(6) Motion to Dismiss the Counts of Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing*

1. Legal Standard

Defendant Cephalon has moved to dismiss the counts of breach of contract and breach of implied covenant of good faith and fair dealing. Cephalon does so pursuant to Rule 12(b)(6). A motion to dismiss for failure to state a claim must be denied "unless the plaintiff could not recover under any reasonably conceivable set

---

[69] *Id.* ¶ 138.

of circumstances susceptible of proof."[70] During this inquiry, the Court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the Plaintiff.[71] However, "[c]onclusory allegations unsupported by specific factual allegations will not be accepted as true."[72] A claim for breach of contract requires: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff."[73] A claim for breach of implied covenant of good faith and fair dealing requires a similar showing, except that the obligation is a "specific *implied* contractual obligation."[74]

### 2. The Plaintiffs Stated a Claim for Breach of Contract

Cephalon argues that the Plaintiffs failed to state a claim for breach of contract because the Plaintiffs failed to plead facts sufficient to establish that Cephalon did not use "commercially reasonable efforts" to develop and commercialize RSZ for EoE, as was their contractual obligation per the Merger Agreement. Furthermore, Cephalon argues that the Complaint shows Cephalon actually used commercially reasonable efforts as it developed and commercialized RSZ as a treatment for EA.

---

[70] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[71] *Id.*

[72] *LeCrenier v. Cent. Oil Asphalt Corp.*, 2010 WL 5449838, at \*3 (Del. Ch. Dec. 22, 2010).

[73] *Cedarview Opportunities Master Fund v. Spanish Broad., Inc.*, 2018 WL 4057012, at \*6 (Del. Ch. Aug. 27, 2018) (internal quotations omitted).

[74] The elements for breach of implied covenant of good faith and fair dealing are "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at \*16 (Del. Ch. Nov. 17, 2014) (internal quotations omitted).

In response, the Plaintiffs point to allegations in their Complaint that studies showed positive results for RSZ as a treatment for EoE[75] and that Cephalon could have submitted RSZ for certain FDA development programs; and that despite the promise of and opportunities for RSZ, Cephalon chose to abandon efforts to commercialize and develop RSZ for EoE. Additionally, the Plaintiffs point out that the Merger Agreement required Cephalon to use commercially reasonable efforts to achieve the Milestones related to RSZ for EoE, and not just for RSZ for EA. To determine whether the Plaintiffs sufficiently pled that Cephalon breached their contractual obligation, I turn first to the contractual obligation.

"Commercially reasonable efforts" is defined in the Merger Agreement as "the exercise of such efforts and commitment of such resources by a company with substantially the same resources and expertise as [Cephalon], with due regard to the nature of efforts and cost required for the undertaking at stake."[76] There is no dispute that this is an objective standard. Furthermore, it is undisputed that other provisions in the Merger Agreement gave Cephalon sole discretion to decide how to proceed with RSZ. That discretion, however, was cabined by the objective standard. Thus the question remains what was required from Cephalon under this standard.

---

[75] Cephalon suggests that results of the EoE endpoint study result were not positive because the study missed one of its two endpoints. However, the EA endpoint study missed its only endpoint and yet Cephalon was still able to commercialize and develop RZA for EA. As a result, and given the pleadings stage of this action, I will assume that the studies showed positive support for RSZ as a treatment for EoE.

[76] Compl. ¶ 74.

16

Contract interpretation "is a question of law and thus suitable for determination on a motion to dismiss."[77] "If the contractual language is 'clear and unambiguous,' the ordinary meaning of the language generally will establish the parties' intent."[78] However, where there is ambiguity, "[o]n a motion to dismiss, a trial court cannot choose between two different reasonable interpretations of an ambiguous document."[79] The Plaintiffs argue that Cephalon was obligated to pursue the development and commercialization of RSZ as a treatment for EoE under all circumstances.[80] The Merger Agreement is clear and unambiguous in this regard: Cephalon was obligated to use only "commercially reasonable efforts," as defined, and was not obligated to pursue RSZ as a treatment for EoE to all ends. However, it is not clear and unambiguous, at this stage in the pleadings, what additional obligation "the exercise of such efforts and commitment of such resources by a company with substantially the same resources and expertise as [Cephalon]" imposes on Cephalon. This contractual language presumptively has meaning.[81] If I were faced with two reasonable interpretations of ambiguous contractual language

---

[77] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *7 (Del. Ch. Dec. 22, 2010)

[78] *Id.*

[79] *Id.*

[80] At Oral Argument, counsel for the Plaintiffs stated that "[t]he reference to similarly situated companies is to talk about a resource, that resources must be expended in an absolute affirmative effort to advance RSZ for EoE. It must occur." Transcript of Oral Argument at 34:22–35:2.

[81] "We will not read a contract to render a provision or term 'meaningless or illusory.'" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

on a motion to dismiss, I would have to deny that motion. Here, as of yet, neither side has convincingly suggested a reasonable interpretation of this language,[82] a fact which similarly supports denial of a motion to dismiss. One reasonable interpretation, I suspect, is to treat the language as intending to define "commercially reasonable efforts" as those efforts "a company with substantially the same resources and expertise as [Cephalon]" *would expend under the circumstances at hand*; such a definition, again supports denial of the Defendants' Motion to Dismiss. Before denying the Motion, however, I analyze whether that language is implicated in the alleged breach of contract.

On many occasions, this Court has dealt—indeed wrestled—with contractual obligations in merger agreements made subject to varying "efforts clauses" imposed

---

[82] *See* Transcript of Oral Argument at 32:23–40:3, 50:8–52:7.

on the acquiring party.[83]  While some cases required factual inquiry and even trial,[84]

others could be (and were) resolved at the pleadings stage.[85]  Cephalon explained to

the Plaintiffs in its November 3, 2016 letter that "it would not be commercially

reasonable for Cephalon to develop [RSZ] for [EoE] for numerous reasons,

including the need to commit substantial resources that such an undertaking would

require in light of other ongoing development and portfolio-building initiatives of

---

[83] For example, in *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*, there was an obligation to use "reasonable best efforts," which "[a]lthough it does not have a specific meaning . . . is, at least, clearly understood by transactional lawyers to be less than an unconditional commitment. 963 A.2d 746, 763 n.60 (Del. Ch. 2009).  In *Ev3, Inc. v. Lesh* there was an obligation to act in "good faith," and the Delaware Supreme Court found that it would not "constitute bad faith . . . to refuse to proceed . . . if the pursuit, after taking into account the milestones and development costs, was not expected to yield . . .  a commercially reasonable profit . . . ." 114 A.3d 527, 541 (Del. 2014).  In *Williams Companies, Inc. v. Energy Transfer Equity L.P.* the Delaware Supreme Court found that provisions that obligated "reasonable best efforts" and "commercially reasonable efforts" together "placed an affirmative obligation on the parties to take all reasonable steps."  159 A.3d 264, 273 (Del. 2017).  For a description of the various standards of "efforts clauses" as defined by certain practitioners and a description of the Delaware Supreme Court's ruling in *Williams* on "commercially reasonable efforts," *see Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *86–88 (Del. Ch. Oct. 1, 2018).  What these various obligations or "efforts clauses" require also depend on the context of the obligation.  In *Williams*, for example, the context was obligations in a merger agreement to expend efforts to achieve necessary pre-requisites for closing, specifically "an affirmative obligation on the parties to take all reasonable steps to obtain [a tax] opinion and otherwise complete the transaction." *Williams*, 159 A.3d at 273.  By contrast, here, the obligation in the merger agreement is to expend efforts *post-merger* and is directed at the discretionary business decisions of the merged corporation.

[84] As the Plaintiffs highlight in their briefing, several notable cases on "efforts clauses" went to trial. *See e.g., Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017); *WaveDivision Holdings, LLC v. Millennium Dig. Media Sys. L.L.C.*, 2010 WL 3706624 (Del. Ch. Sept. 17, 2010); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ch. 2008).

[85] *See, e.g., Alliance Data Sys. Corp.*, 963 A.2d 746 (granting a motion to dismiss a breach of contract claim where there was an obligation to use "reasonable best efforts"); *Sparton Corp. v. O'Neil*, 2017 WL 3421076 (Del. Ch. Aug. 9, 2017) (granting a motion to dismiss a breach of contract claim where there was an obligation to use "commercially reasonable efforts").

the company."[86]  The Plaintiffs allege that there was promise and opportunity in RSZ as a treatment for EoE.  However, as Cephalon points out, the Plaintiffs have not made any allegations that pursuing such promise and opportunity was commercially reasonable "with due regard to the nature of efforts and cost required for the undertaking at stake."[87]  That is, the Plaintiffs have not alleged any facts that controvert Cephalon's stated economic rationale for abandoning RSZ as a treatment for EoE.

If taking into account the "nature of efforts and cost" was all that was required of Cephalon, it might be appropriate and consistent with this Court's prior rulings to grant a motion to dismiss for failure to state a claim in this instance, as the Plaintiffs did not allege facts from which to reasonably infer that the "nature of efforts and cost" supported continued efforts.  However, Cephalon was also obligated to "exercise . . . such efforts and commit[] . . . such resources [as] a company with substantially the same resources and expertise as [Cephalon]."[88]  In their Complaint, the Plaintiffs alleged that several companies with substantially the same resources and expertise as Cephalon are currently working to develop treatments for EoE.  I assume that one reasonable reading of the contractual language here is that the actions of other similarly situated companies are a relevant yardstick to decide at this

---

[86] Compl. ¶¶ 106, 107; *id.* at Ex. C.
[87] *Id.* ¶ 74.
[88] *Id.*

stage in the pleadings whether Cephalon itself used "commercially reasonable efforts." At Oral Argument, the Defendants argued that, even so, the exemplars in the Complaint are not similar to the Defendant entities, and are not pursuing approval of the same antibody. The Defendants conclude that the actions of these companies are ultimately irrelevant to the reasonableness inquiry here. Perhaps so. However, at the pleading stage, I find that the allegation that similarly situated companies are pursuing treatments for EoE reasonably supports the inference that Cephalon, in doing otherwise, did not meet its contractual responsibility here.

In light of the absence of reasonable interpretations of the contractual obligation to "exercise [ ] such efforts and commit[ ] such resources by a company with substantially the same resources and expertise as Parent, with due regard to the nature of efforts and cost required for the undertaking at stake," the relative novelty of this contractual obligation, and the Plaintiffs' allegations that companies with similar resources and expertise as Cephalon are currently developing treatments for EoE, I cannot say that the Plaintiffs cannot recover under any reasonably conceivable set of circumstances susceptible of proof. As a result, the Motion to Dismiss as it relates to the breach of contract claim brought against Cephalon must be denied.

### 3. The Plaintiffs Failed to State a Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

Defendant Cephalon moved to dismiss the claim of breach of implied covenant of good faith and fair dealing. "When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[89] That is, "because the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[90]

Here, the subject at issue is Cephalon's efforts (or lack thereof) to commercialize and develop RSZ for EoE. Cephalon argues that the parties to the Merger Agreement expressly chose an objective standard, "commercially reasonable efforts," as defined in the Agreement, to measure Cephalon's efforts, and that this standard leaves no "gap" for an implied term. The Plaintiffs, in turn, argue that they "reasonably expect[ed] that Cephalon would take affirmative steps to develop and commercialize RSZ for EoE" and "Cephalon's refusal to develop and commercialize RSZ for EoE is unreasonable and arbitrary, and intentionally designed to avoid achieving [the Milestones in the Merger Agreement and making the associated

---

[89] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014).
[90] *Id.* (quoting *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008)).

22

payments] . . . ."[91]  The Plaintiffs contend that there is no language in the Merger Agreement to address such behavior.

The Plaintiffs have not, however, identified a gap in the Merger Agreement, and there is therefore no role for the implied covenant of good faith and fair dealing. Cephalon and the Plaintiffs contracted for a series of Milestones and related payments, and Cephalon agreed to use "commercially reasonable efforts" to achieve those Milestones. "Commercially reasonable efforts," as defined by the Agreement, is an objective standard. Cephalon did not meet the Milestones related to RSZ as a treatment for EoE and the Plaintiffs cried foul. The Agreement set a contractual standard by which to evaluate whether Cephalon's failure to achieve and pay these Milestone payments was improper.[92]  The standard (once adequately construed) is applicable and relevant, even if Cephalon's failure to achieve the Milestones was based on complete inaction or if it was based on Cephalon's opinion that the Milestone payments would make the endeavor uneconomical. As such, in the light most favorable to the Plaintiffs, there is nevertheless no gap.

Through their claim of breach of an implied covenant of good faith and fair dealing, the Plaintiffs seek to impose an alternative standard with which to review

[91] Compl. ¶¶ 129, 130.
[92] Here, I paraphrase Chancellor Bouchard in *Fortis Advisors LLC v. Dialog Semiconductor PLC*. 2015 WL 401371, at *5 (Del. Ch. Jan. 30, 2015) ("Thus, the Merger Agreement sets a contractual standard by which to evaluate if Dialog's failure to achieve and pay the earn-out payments in its operation of the Power Conversion Business Group was improper.").

23

Cephalon's efforts. To the extent I understand the Plaintiffs' view, this alternative standard prohibits Cephalon from abandoning efforts to develop and commercialize RSZ for EoE because that abandonment could never be "commercially reasonable" in light of the associated Milestone payments.[93] But this contradicts the express understanding of the parties.

The Plaintiffs, having agreed to the Milestones being *contingent* on Cephalon's "commercially reasonable efforts," cannot now contend that they did not actually expect any contingency. "The implied covenant of good faith and fair dealing . . . serves a gap-filling function by creating obligations *only where the parties to the contract did not anticipate some contingency*, and had they thought of it, the parties would have agreed at the time of contracting to create that obligation."[94]

Ception and Cephalon negotiated over the Milestones in the Merger Agreement, and the bargained-for language requires Cephalon to use "commercially

---

[93] The Plaintiffs cite the Delaware Supreme Court for the proposition that "[s]ophisticated parties in competitive negotiations 'do not include obvious and provocative conditions' in their agreements." Pls. Br. in Opp'n to Defs.' Mot. to Dismiss at 38 (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 368 (Del. 2017)). Plaintiffs then claim that an "obvious and provocative" condition in this case would be "Cephalon will not act in an unreasonable and arbitrary manner to intentionally avoid achieving Development Milestones in order to avoid making Development Milestone Payments." *Id.* The Plaintiffs define their own position to be "that Cephalon deliberately thwarted the clinical approval process in order to avoid making contractually mandated payments to the former stockholders." *Id.*

[94] *Am. Capital Acquisition Partners, LLC v. LPL Holdings*, 2014 WL 354496, at *5 (Del. Ch. Feb. 3, 2014).

24

reasonable efforts" to achieve those Milestones. I have found that a claim for breach of contract based on that "commercially reasonable efforts" standard survives the Defendants' Motion to Dismiss and may proceed past the pleadings stage. However, no gap exists within which to employ implication, and the implied covenant claim must be dismissed.[95]

*B. Teva Ltd. and Teva USA's Rule 12(b)(6) Motion to Dismiss the Count of Tortious Interference with Contract*

1. Legal Standard

Defendants Teva Ltd. and Teva USA argue that the tortious interference with contract claim against them should be dismissed for failure to state a claim, pursuant to Rule 12(b)(6). I have already reviewed the applicable legal standard for Rule 12(b)(6) above. A claim for tortious interference with contract requires a showing that: "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury."[96]

Teva Ltd. is an Israeli company. Its principal place of business is Petah Tikva, Israel.[97] In addition to moving to dismiss under Rule 12(b)(6), Teva Ltd. also moved to dismiss on the ground of lack of personal jurisdiction under Rule 12(b)(2).

---

[95] "[T]he implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal." *Winshall v. Viacom Intern., Inc.*, 55 A.3d 629, 637 (Del. Ch. 2011).

[96] *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

[97] "Such a city, everybody loves it." *See* David Yazbek, *The Band's Visit* (Broadway 2017).

Logically, this defense should be examined first, as absent jurisdiction any resolution of the Rule 12(b)(6) motion with respect to Teva Ltd. would be moot. In this case, however, the jurisdictional issues, involving Teva Ltd.'s business-related actions within this jurisdiction and its alleged contractual waiver of jurisdictional defenses, are complex. Moreover, the Rule 12(b)(6) defense mounted by Teva Ltd. is practically indistinguishable from that raised by Teva USA, jurisdiction over which is unquestioned; in other words, the Rule 12(b)(6) defense must be engaged whether or not Teva Ltd. remains in the case. Because I find that I must dismiss the claims against both Teva entities under Rule 12(b)(6), I need not reach the jurisdictional defense.

Returning to the Rule 12(b)(6) Motions to Dismiss, Teva Ltd. and Teva USA are affiliates of Cephalon. "The gist of a well-pleaded complaint for interference by a corporation of a contract of its affiliate is a claim that the 'interfering' party was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises."[98] The other side of the same coin would be that the "affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure the plaintiff."[99] In the parent-subsidiary context, "the test for holding a parent corporation liable for tortious interference ha[s] to be high or every-day consultation

---

[98] *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994).
[99] *Id.*

26

or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases."[100]  With that guidance in mind, I evaluate the Motions to Dismiss.

### 2. The Plaintiffs Failed to State a Claim of Tortious Interference Against Teva Ltd. and Teva USA

In support of their Motions to Dismiss, Teva Ltd. and Teva USA argue that the Plaintiffs made only conclusory allegations of bad faith in their Complaint and thus failed to adequately plead bad faith on the part of Teva Ltd. or Teva USA.  They further argue that the Plaintiffs failed to plead any actual acts taken by either Teva Ltd. or Teva USA in regard to the alleged breach of contract.[101]  The Plaintiffs did allege in their Complaint that Teva Ltd. and Teva USA "did not pursue the profit-seeking objectives of Cephalon, but instead acted in bad faith to injure Plaintiffs,"[102] and also alleged that "Teva Ltd. and/or Teva USA control the actions of Cephalon."[103]  The Plaintiffs disagree that their allegations are merely conclusory and argue that their claim is a fact-intensive one that should survive a motion to dismiss.

---

[100] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006).
[101] Teva USA and Teva Ltd. also argue that the Plaintiffs failed to adequately plead an underlying breach of contract, which is a necessary element of a claim of tortious interference with contract. As discussed above, I find that the Plaintiffs have, given this early stage in the pleadings, alleged sufficient facts to defeat a motion to dismiss on the breach of contract claim.
[102] Compl. ¶ 138.
[103] *Id.* ¶ 28.

The Plaintiffs argue that they have alleged, or that it can be reasonably inferred from their allegations, that Teva Ltd. and Teva USA have taken intentional acts that were significant factors in causing a breach of contract and did so for reasons other than legitimate profit-seeking activities of the affiliated enterprise. In their Complaint, the Plaintiffs aver that Teva Ltd. acquired Allergan Generics, and as a result, Teva Ltd. planned to launch thousands of generic products. However, this allegation says nothing of the effect of the Allergan acquisition on Cephalon and on the Merger Agreement. The Plaintiffs ask that I infer—based on the fact that Teva Ltd. acquired Allergan—that Teva Ltd. instructed Cephalon, an existing subsidiary, to breach its contract with the Plaintiffs, presumably in order to focus on Teva Ltd.'s plan for Allergan. However, I do not find it is reasonable to infer from *only* the fact that a parent company acquired another subsidiary that the parent then directed a different subsidiary to abandon its contractual obligations. Such an inference is unreasonable, without further factual allegations linking the parent's plans for its new subsidiary to the parent's plans for its existing subsidiaries. For example, there is no allegation in the Complaint that Allergan and Cephalon are competitors, such that it may be reasonable to infer that Teva Ltd. may prefer one to the detriment of the other. Nor do the Plaintiffs posit in their Complaint that Teva Ltd. has insufficient resources, such that it may be reasonable to infer that Teva Ltd.'s acquisition and plan for Allergan would necessarily involve removing resources

28

from Teva Ltd.'s other subsidiaries. The pleading, in this regard, is simply conclusory.

In their Complaint, the Plaintiffs also alleged that the FDA launched new development programs and that *Cephalon* did not pursue a designation in these programs for RZA as a treatment for EoE. This allegation makes no mention of either Teva Ltd. or Teva USA. I do not find it reasonable to infer from the fact Cephalon, a subsidiary of Teva Ltd., made a decision not to seek designation in this program, that the decision was actually made by Teva Ltd., its parent, or Teva USA, its affiliate, let alone that the decision was taken for reasons other than the legitimate pursuit of their business.

Finally, the Plaintiffs alleged in their Complaint that an independent study, performed by a former researcher of the EoE open label extension study, produced positive results. The Plaintiffs do not allege in their Complaint that those result were ignored by Cephalon, much less by Teva Ltd. or Teva USA. I do not find it reasonable to infer, from a mere description of a study done independent of Cephalon that Teva Ltd. or Teva USA took action—or; more accurately here, inaction. The allegations that the Plaintiffs cite, even with all reasonable inferences drawn in their favor, do not support the allegation that Teva Ltd. or Teva USA intentionally acted to interfere with the Merger Agreement, much less that they did so in bad faith. The allegation is therefore conclusory.

The Plaintiffs also allude to their correspondence with an employee of Teva USA about Cephalon's efforts related to RSZ. It was this employee who told the Plaintiffs that Cephalon would no longer pursue RSZ for EoE, effectively ending Cephalon's obligations in the Merger Agreement. However, it is not reasonable to infer from those facts alone that Teva Ltd. or Teva USA, as affiliates of Cephalon, acted with an improper purpose. The sole act of ending efforts to develop the antibody, which Cephalon was permitted to do if development is not commercially reasonable, cannot by itself be inferred to be improper conduct on behalf of Teva Ltd. or Teva USA. In the parent-subsidiary or affiliate context, this Court has held that a high standard applies; otherwise, a parent and a subsidiary would be unable to discuss the subsidiary's contractual obligations without pulling the parent into a breach of contract suit. As a result, Rule 12(b)(6) requires that the tortious interference with contract claim against Teva Ltd. and Teva USA be dismissed.

*C. The Defendants Motion to Dismiss Based on the Plaintiffs' Acquiescence*

The Defendants argue that each of the Plaintiffs' claims should be deemed forfeited under the acquiescence doctrine. As explained above, only the Plaintiffs' claim of breach of contract against Cephalon remains; the rest of the Plaintiffs' claims have been dismissed. With respect to the remaining claim, dismissal based on acquiescence is premature at this pleadings stage. "To prevail on a defense of acquiescence, a defendant must show: "(1) the plaintiff remained silent (2) with

knowledge of her rights (3) and with the knowledge or expectation that the defendant would likely rely on her silence, (4) the defendant knew of the plaintiff's silence, and (5) the defendant in fact relied to her detriment on the plaintiff's silence."[104]

The Plaintiffs' Complaint does not support an argument for acquiescence. The acquiescence doctrine is particularly fact intensive, and the facts supporting acquiescence are not in the record. As a result, I deny the Defendants' Motion to Dismiss based on acquiescence.

## III. CONCLUSION

The count of tortious interference with contract brought against Defendants Teva Ltd. and Teva USA is dismissed for failure to state a claim pursuant to Rule 12(b)(6). As a result, Teva Ltd.'s Motion to Dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) is moot. The count of breach of implied covenant of good faith and fair dealing brought against Defendant Cephalon is also dismissed for failure to state claim under Rule 12(b)(6). However, the count of breach of contract brought against Cephalon survives the Defendants' Motion to Dismiss. As a result, the Defendants' Motions to Dismiss are granted in part and denied in part. The parties should provide an appropriate form of order.

---

[104] *Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*, 2018 WL 4057012, at *13 (Del. Ch. Aug. 27, 2018) (internal quotations omitted).