**SUPERIOR COURT**
**OF THE**
**STATE OF DELAWARE**

MEGHAN A. ADAMS
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0634

November 27, 2023

Steven L. Caponi, Esq.
Matthew B. Goeller, Esq.
Megan E. O'Connor, Esq.
K&L Gates LLP
600 N. King Street Suite 9011
Wilmington DE, 19801

John P. DiTomo, Esq.
Rachel R. Tunney, Esq.
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
Wilmington, DE 19899

RE:   *Shakesby v. SNC International, et al.*
      C.A. No.: N22C-11-070 MAA CCLD

Dear Counsel:

Pending before the Court is Defendants Sierra Nevada Corporation ("SNC")

and SNC International Holdings Ltd.'s ("Acquisition Sub")[1] Motion to Dismiss

Plaintiff Anthony Jonathan Shakesby's Amended Complaint.  For the following

reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.

## I.    FACTUAL BACKGROUND

Prior to 2015, Andrew David Jackson, David Mills, Anthony Jonathan

Shakesby, and Robin Southwell (the "Equityholders") owned all of the issued shares

---

[1] SNC and Acquisition Sub are collectively referred to herein as the "Defendants."

in 328 Group Limited ("328").[2] 328 owned the entire issued share capital in 328 Support Services GmbH ("328SSG" or the "Company"), a private company that provided, among other things, support and logistics services to the operating fleet of Dornier 328 family of jet and turboprop regional aircraft (the "Aircraft").[3]

The Aircraft is a turboprop-powered commuter airliner initially produced by Deutsche Aerospace.[4] By 2005, financial difficulties resulted in the suspension of the Dornier 328 manufacturing program.[5] The Company, however, "preserve[d] full aircraft production capabilities for future use" and intended to recommission scaled production when market conditions improved.[6] This included maintaining the Type Certificate,[7] keeping the Company's supply chain intact, and ensuring that the infrastructure needed to recommence manufacturing remained available.[8] The Company also monetized its intellectual property rights in the Dornier 328, including the sale and/or licensing of intellectual property rights in various aircraft parts.[9]

---

[2] Amended Complaint ("Am. Compl."), Transaction ID 69357574, ¶ 1. In December 2005, the Equityholders acquired the entire share capital of 328 as part of the purchase arrangement and therefore acquired the rights to the Dorner 328. *Id.* ¶ 6.

[3] *Id.* From 2005 through 2011, the shares in 328SSG were held by Price Waterhouse Coopers for the benefit of the Company's former lenders. *Id.* ¶ 44.

[4] *Id.* ¶ 4. The Company also serves as the Original Equipment Manufacturer ("OEM") of parts for the Aircraft. *Id.* ¶¶2, 50. As the OEM, 328SSG produces and installs parts for the Dornier 328 and has control over design and manufacture of parts. *Id.* ¶ 50.

[5] *Id.* ¶ 43.

[6] *Id.* ¶ 43.

[7] A Type Certificate is issued to signify the airworthiness of the approved design or "type" of aircraft to be manufactured and granted exclusively to competent organizations. Am. Compl. ¶46.

[8] *Id.* ¶ 43.

[9] *Id.* ¶ 54.

Sometime around 2011, the Company's stated objective was to "restart large scale production of new Aircraft to ensure the Company's long term [sic] viability."[10] In 2013, the Equityholders began exploring various financing and transactional options with several third parties, including SNC.[11] When SNC approached the Company, SNC purportedly insisted that the Equityholders cease all sale discussions with third parties as a condition of continuing negotiations.[12]

Prior to executing the Stock Purchase Agreement ("SPA"), SNC represented to the Equityholders that SNC "had secured a deal with the Turkish government, acting through its transport and military ministries, whereby the Turkish government would fund a larger-scale Dornier 328 manufacturing program."[13]

On January 30, 2015, Acquisition Sub, the Equityholders, Anthony Jonathan Shakesby (acting in his capacity as Equityholder Representative) and SNC[14] entered into the SPA to purchase all of the Equityholders' issued share capital of 328 and the Company.[15] According to the Equityholders, the "SPA was specifically structured around the concept of a partnership and SNC's commitment to

---

[10] Am. Compl. ¶8, Exhibit B.
[11] *Id.* ¶¶ 10, 61.
[12] *Id.* ¶¶ 12, 66-67. During negotiations, "SNC repeatedly emphasized to the Equityholders that time was of the essence and on multiple occasions threatened to cease negotiations if the discussions were not exclusively between SNC and the Equityholders." *Id.* ¶67.
[13] *Id.* ¶ 22.
[14] SNC was a significant customer of 328SSG, who had utilized the Company's services for its own customers. *Id.* ¶64.
[15] *Id.* ¶ 13.

operate/fund a post-closing 328SSG program to build and sell Dornier regional aircraft in large volumes (the 'Do328 Program')."[16]

Pursuant to the SPA, the Initial Consideration to the Equityholders was $30 million (minus indebtedness and Transaction Expenses), with a potential to receive a maximum of $70 million in Deferred Consideration tied to the anticipated success of the Do328 Program.[17] The Equityholders are entitled to Deferred Consideration for up to fifteen years after the signing of the SPA without a Funded Order.[18]

Pursuant to Section 2.5(a) of the SPA, upon the receipt of a Funded Order, Acquisition Sub was obligated to pay an Initial Deferred Payment of $10 million.[19] A Funded Order is defined as "an order or series of orders for at least thirty (30) Aircraft for which the Company, any of the Company's Affiliates, Turkey Co. or any of Turkey Co's [sic] Affiliates has received an aggregate nonrefundable payment of no less than $20,000,000."[20] The Equityholders would receive an Incremental Deferred Payment of $300,000 for each additional Aircraft Sale until

---

[16] *Id.* ¶ 72. "To facilitate the transaction, Acquisition Sub was formed solely for the purpose of owning [the Target] and securing the funding and administration of the Do328 Program. Acquisition Sub is 100 percent indirectly owned by SNC and established in a tax-efficient jurisdiction specifically to benefit SNC in relation to the financing of its investment and anticipated return on that investment." *Id.* ¶ 73.

[17] *Id.* ¶¶ 17-18, 74.

[18] *Id.* ¶ 19. According to the Amended Complaint, "[t]his limitation was created in response to SNC's requirement from an accounting perspective not to have an open-ended, 'evergreen' obligation." *Id.*

[19] *Id.* ¶ 76.

[20] *Id.* ¶ 76.

the Incremental Deferred Payment Cap of $50,000,000 was reached.[21] Further, the Equityholders would receive the first $10 million of any IP Sale, including licensing arrangements that would not be included or counted against the Incremental Deferred Payment Cap.[22] Finally, after the first $10 million receivables of any IP Sale, the Equityholders would receive 50 percent of the gross consideration received by the Acquisition Sub for any IP Sale; however, this IP Sale Payment would be counted against the Incremental Deferred Payment Cap.[23]

Important to this dispute, Acquisition Sub represented and warranted to "manage the business conducted by the Company and its Subsidiaries in the Ordinary Course of Business consistent with past practices."[24] Acquisition Sub further warranted that it would refrain from making any decisions that "would have a materially adverse impact on the probability that the Initial Deferred Payment or any Incremental Deferred Payment would be payable or on any IP Sale Payment."[25] Acquisition Sub further agreed to refrain from taking "any action (including internal

---

[21] *Id.* ¶ 77.
[22] *Id.* ¶ 78.
[23] *Id.* ¶ 78.
[24] *Id.* ¶ 81; SPA § 2.5(f)(i). The SPA defines "Ordinary Course of Business" as "the ordinary course of the Company's business or its Subsidiaries' businesses, as applicable, consistent with the past practice of the Company or its Subsidiaries, as applicable." SPA § 1.1. The Company's Business means "the manufacturing, servicing or provisioning of Dornier-model Aircrafts." *Id.* "Company Intellectual Property" is defined as "All Intellectual Property used in or necessary to conduct the Company Business, including, without limitation, the design, development, manufacture, use, import, export, sale, licensing or other exploitation of Company Offerings." *Id.*
[25] Am. Compl. ¶ 81 (citing SPA § 2.5(f)(ii)).

5

restructurings) with the purpose of materially frustrating, hindering, impairing, or delaying the ability of the Equityholders to earn the Initial Deferred Payment or Incremental Deferred Payments."[26]

Also relevant to this dispute, the SPA contains a Guaranty whereby SNC "unconditionally and irrevocably guarantees the prompt and full discharge by Acquisition Sub of all of its covenants, agreements, obligations and liabilities under this Agreement including the payment of all Initial Consideration, Earnout Consideration and Deferred Consideration."[27]

Following the execution of the SPA, the Turkish government never followed through on its interest in funding a Dornier 328 manufacturing program.[28] Misunderstandings arose between SNC and the Turkish government concerning the parties' respective expectations for the Aircraft and the terms of any investment or sale of the Do328Program.[29] As a result of these misunderstandings, the negotiations for the project with the Turkish government were terminated.[30]

Even when SNC did locate an interested third party to invest in a program for the Aircraft, SNC allegedly informed the Equityholders that it would not go through with any potential transaction unless the Equityholders released SNC from its

---

[26] *Id.* ¶ 81 (citing SPA § 2.5(f)(iv)).
[27] *Id.* ¶82 (citing SPA § 9.14).
[28] *Id.* ¶24.
[29] *Id.* ¶89.
[30] *Id.* ¶89.

guarantee under the SPA.[31] "Specifically, SNC repeatedly demanded that the Equityholders agree to move the Deferred Consideration obligations to a newly-established program company and release SNC from its guarantee obligations under Section 9.14 of the SPA."[32]

The Equityholders allege that SNC also failed to make commercially reasonable efforts to execute a deal to sell or license the Company's intellectual property.[33] According to the Equityholders, a potential deal with the Chinese government of a "manufacturing and marketing agreement" fell through because of the potential of a significant Deferred Consideration payment to the Equityholders.[34] The Equityholders allege that "SNC has decided to deliberately slow-walk its efforts to monetize these assets until after the Termination date so that it will no longer owe Deferred Consideration to the Equityholders."[35]

## II. PROCEDURAL HISTORY

Plaintiff filed the Complaint on November 8, 2022.[36] On January 17, 2023, Defendants filed their Motion to Dismiss Plaintiff's Complaint and Opening Brief in Support of their Motion to Dismiss the Complaint.[37] Pursuant to a stipulation

---

[31] *Id.*¶¶ 29, 100, 103, 104.
[32] *Id.* ¶100.
[33] *Id.* ¶107.
[34] *Id.* ¶ 107.
[35] *Id.* ¶ 110.
[36] D.I. 1.
[37] D.I. 13, 14.

7

between the parties, on March 14, 2023, Plaintiff filed the Amended Complaint.[38] On May 2, 2023, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint and Opening Brief in Support of their Motion to Dismiss the Amended Complaint.[39] The parties completed briefing on the Motion to Dismiss the Amended Complaint on June 23, 2023 and the Court heard oral argument on the Motion to Dismiss on August 4, 2023.[40]

## III. ANALYSIS

Pursuant to Superior Court Rule 12(b)(6), the Court must: (a) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, and (3) draw all reasonable inferences in favor of the non-moving party.[41] The "governing standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[42] The court will draw every reasonable factual inference in favor of the non-moving party, and must deny the motion to dismiss if the claimant may recover under that standard.[43] Dismissal is not warranted unless a claim is clearly without merit.[44]

---

[38] D.I. 21.
[39] D.I. 27.
[40] D.I. 31, 32, 38.
[41] *Cent. Morg. Co. v. Morgan Staley Morg. Cap. Holdings, LLC*, 27 A.3d 531, 535 (Del. 2011).
[42] *Id.* at 537.
[43] *BeautyCon Media ABC Trust Through Saccullo Business Consulting, LLC v. New General Market Partners, LLC*, 2023 WL 5164148, at *3 (Del. Super. Aug. 11, 2023) (citation omitted).
[44] *Id.* (citation omitted).

## IV. PLAINTIFF STATES A CLAIM, IN PART, FOR BREACH OF CONTRACT

To plead a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract; (2) a breach of the contract; and (3) damages suffered as a result of the breach.[45] The only issue for the Court to decide on this Motion to Dismiss is whether Plaintiff alleges a breach of the SPA. For the foregoing reasons, the Court holds that Plaintiff states a claim, in part, for breach of contract.[46]

### a. Plaintiff States a Claim for Breach of Section 2.5(f)(i)

Section 2.5(f)(i) of the SPA states that Defendants are required to "manage the business conducted by the Company and its Subsidiaries in the Ordinary Course of Business consistent with past practices." The Amended Complaint alleges that Defendants breached this provision in two ways: (1) by failing to manufacture the Aircraft; and (2) by failing to monetize the Company's intellectual property.[47]

"Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable

---

[45] *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *3 (Del. Super. June 27, 2016).

[46] To the extent Plaintiff states a claim for breach of contract, Plaintiff's claim for declaratory judgment regarding SNC's Guaranty in Section 9.14 of the SPA also survives the Motion to Dismiss. For these reasons, the Court will also not consider Defendants' argument that Plaintiff cannot state a claim against SNC because the SPA did not place any affirmative obligation on SNC. *Shakesby v. SNC Int'l Hldgs., Ltd*, C.A No. N22C-11-070 (MAA CCLD) (Aug. 4, 2023) TRANSCRIPT at 13. The Court leaves open the possibility of Defendants raising this argument at a later time in the proceedings.

[47] Compl. ¶¶112-121.

third party."[48] When interpreting the SPA, the Court "will read a contract as a whole and give each provision and term effect, so as not to render any part of the contract mere surplusage."[49] The Court "will not read a contract to render a provision or term meaningless or illusory."[50] When interpreting a contract, "the role of a court is to effectuate the parties' intent."[51]

In reading the SPA as a whole, the Court finds that Plaintiff alleges a breach of Section 2.5(f)(1) regarding the requirement to manage the Company in the Company's "Ordinary Course of Business." "Ordinary Course of Business" is defined as "the ordinary course of the Company's business or its Subsidiaries' businesses, as applicable, consistent with the past practice of the Company or its Subsidiaries, as applicable…."[52] Although "business" is not a defined term, the SPA does define "Company Business" as "the manufacturing, servicing or provisioning of Dornier-model Aircrafts."[53] Further, "Company Intellectual Property" is defined as "any and all Intellectual Property used in or necessary to conduct the Company Business, including, without limitation, the design, development, manufacture, use, import, export, sale, licensing or other exploitation of Company Offerings."[54]

---

[48] *NBC Universal v. Paxon Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).
[49] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation omitted).
[50] *Id.*
[51] *Lorilland Tobacco Co. v. Am. Legacy Found*, 903 A.2d 728, 739 (Del. 2006).
[52] SPA § 1.1.
[53] SPA § 1.1.
[54] *Id.* "Company Offerings" is defined as "all products or service offerings of the Company and the German Subsidiaries that have been marketed, sole, or distributed, or that as of the date hereof

Reading the above provisions together, the Court finds that it is reasonably conceivable that manufacturing the Aircraft and monetizing the Company's intellectual property were part of the Company's business at the time the parties entered into the SPA. The case cited by Defendants, *Copper Tire & Rubber Co. v. Apollo (Mauritius Holding) Holdings Pvt. Ltd.*,[55] for the proposition that an ordinary course covenant "must be measured by an alleged deviation from the Company's past practices that existed at the Company prior to closing"[56] is a post-trial decision where the Court had the benefit of a full record.[57] Giving all reasonable inferences in favor of the Plaintiff, as it must, the Court finds that Plaintiff states a claim for breach of SPA Section 2.5(f)(i).

### b. Plaintiff does not State a Claim for Breach of Sections 2.5(f)(ii) or (iv)

Section 2.5(f)(ii) of the SPA states that Defendants could "not make any decisions that would have a materially adverse impact on the probability that the Initial Deferred Payment or any Incremental Deferred Payment would be payable,

---

the Company and/or the German Subsidiaries intend to market, sell or distribute, including any product or service offering under development as of the date hereof, and including any such products or service offerings that form the basis, in whole or in part, of any revenue or business projection provided to the Acquisition Sub and/or its Affiliates prior to the date hereof." *Id.*

[55] 2014 WL 5654305 (Del. Ch. Oct. 31, 2014).

[56] Opening Br. at 19.

[57] *Cooper Tire*, 2014 WL 5654305, at *1, 17. Another case cited by Defendants, *AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC*, 268 A.3d 198 (Del. 2021), likewise involved a post-trial determination regarding an ordinary course covenant. *See AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020) (holding that, after a five-day trial, that the seller breached the "Ordinary Course Covenant" in the sale agreement).

or on any IP Sale Payment." Section 2.5(f)(iv) requires that Defendants "not take any action (including internal restructurings) with the purpose of materially frustrating, hindering, or impairing or delaying the ability of the Equityholders to earn the Initial Deferred Payment or Increment Deferred Payments."

Plaintiff does not state a claim for breach of Sections 2.5(f)(ii) or (iv). On this point, the Court of Chancery's decision in *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*[58] is instructive. The covenant at issue in *Blackstone* provided that the buyer would ensure Blackstone would "not … take or cause or permit to take any action (including the acquisition of businesses or assets) which would reasonably be expected to prevent or materially impair or delay the consummation of the transactions contemplated by this Agreement."[59] This provision was "limited to keeping Blackstone from acting in an affirmative way to prevent, impair, or delay the closing of the Merger."[60] In other words, it "was a negative covenant directed toward making sure that [Aladdin and its Parent Group] did not take affirmative action designed to thwart the closing of the Merger."

The court held that the plaintiff in *Blackstone* failed to "identify any affirmative step Blackstone took that impeded the Merger's closing in any way;"

---

[58] 963 A.2d 746 (Del. Ch. 2009).
[59] *Id.* at 765.
[60] *Id.*

rather, plaintiff complained about what Blackstone did not do. [61] The court found that such "allegations are not the stuff of which a violation of a negative covenant like §6.5.6 is made" because liability under a negative covenant can only arise from action."[62]

The same is true here. As negative covenants, Sections 2.5(f)(ii) and (iv) do not impose any affirmative duty to act on behalf of the Defendants. The only allegations in the Amended Complaint regarding a violation of the negative covenants involve alleged affirmative action on behalf of the Defendants: "(a) failing to agree to funding from investors unless the Equityholders gave up contractual rights;" "(b) refusing to monetize the Company's IP because the Equityholders would receive some of the revenue;" and "(c) delaying any investments or sale or licensing transactions until the Termination Date expired."[63] Each of these allegations involve alleged affirmative conduct on behalf of the Defendants and therefore, under established Delaware law, cannot be a breach of Sections 2.5(f)(ii) and (iv).[64]

---

[61] *Id.*
[62] *Id.* at 766.
[63] Ans. Br. At 22.
[64] *See Blackstone*, 963 A.2d at 751 (holding that the plaintiff could not attempt to convert a negative covenant into a "wide-ranging promise to take any affirmative action necessary to obtain" the desired effect).

**V. PLAINTIFF DOES NOT STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

To state a claim for a breach of the implied covenant of good faith and fair dealing, Plaintiff must allege: "(1) a specific implied contractual obligation; (2) a breach of that obligation; and (3) resulting damages."[65]  "The implied covenant, inherent in all agreements, ensures that the parties deal honestly and fairly with each other when addressing gaps in their agreement."[66]  Although the "court's goal is to preserve the economic expectations of the parties," the implied covenant is a "limited and extraordinary legal remedy."[67]  The implied covenant will not be invoked "when the contract addresses the conduct at issue."[68]

The Amended Complaint follows the recent trend of tacking on an alleged breach of the implied covenant in the event a plaintiff's breach of contract claim fails.  Here, Count II of the Amended Complaint suffers the same fate as most claims for the implied covenant that merely attempts to re-cast breach of contract claims into a breach of the implied covenant.[69]  The allegations in Count II either recycle

---

[65] *KT4 Partners, LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *26 (Del. Super. June 24, 2021).

[66] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (citation omitted).

[67] *Id.* (internal citations and quotations omitted).

[68] *Id.*

[69] *Outbox Systems, Inc. v. Trimble Inc.*, 2022 WL 3696773, at *8 (Del. Super. Aug. 24, 2022) ("Delaware's trial courts have shown growing antipathy toward both bootstrapped and needlessly duplicative claims in what are otherwise straightforward breach-of-contract cases.") (citing decisions).  *But compare Malt Family Trust v. 777 Partners LLC*, 2023 WL 7476966, at * (Del.

14

arguments already made in support of Plaintiff's breach of contract claim or attempt to re-write the bargain struck by the parties.[70] Therefore, Count II must be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss the Amended Complaint is GRANTED in part and DENIED in part.  The parties shall confer and submit a proposed scheduling order for the Court's consideration within thirty days of this opinion.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

cc:    Prothonotary

---

Ch. Nov. 13, 2023 (implied covenant claim survived a motion to dismiss where no contract language specifically addressed the issue in dispute).

[70] Plaintiff also attempts, in its Answering Brief, to argue that Defendants owed fiduciary duties by way of the implied covenant to the Plaintiff.  Delaware law, however, is clear – the duties owed under the implied covenant and fiduciary duties are not one and the same.  *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) ("The implied covenant of good faith and fair dealing is a creature of contract, distinct from the fiduciary duties that the plaintiff asserts here.").